**STATE of Tennessee, Appellee,**

v.

**Wayne Lee BATES, Appellant.**

Supreme Court of Tennessee,
at Nashville.

Jan. 14, 1991.

Rehearing Denied Feb. 25, 1991.

Charles W. Burson, Atty. Gen. & Reporter, Debra K. Ingles, Asst. Atty. Gen., Nashville, for appellee.

Robert S. Peters, Winchester, Roger J. Bean, Tullahoma, for appellant.

OPINION

O'BRIEN, Justice.

This defendant entered a plea of guilty to the offense of murder in the first degree and grand larceny and submitted the issue of punishment to a jury, as required by T.C.A. § 39-2-203. He did not waive his objection to an order, entered by the court, overruling a motion to suppress a confession, or his right to appeal in the event the confession was introduced at the penalty phase of the proceedings.

The various admissions were admitted at his sentencing hearing. Defendant ascribes error to the trial court action overruling his motion to suppress evidence of his confession, as well as evidence of the subsequent statements made by him, which he insists were the fruits of his original confession. It is his insistence that these statements were made while he was in custody and after he had informed the authorities of his desire for counsel. He says the interrogations engaged in by the authorities were not initiated by him.

The evidentiary basis leading to the admission which defendant says was taken in violation of his constitutional rights indicate that on 4 June 1986, after breaking into a residence in Allen County, Kentucky, defendant was incarcerated in the Allen County Jail, charged with first degree burglary, possession of stolen property, and two misdemeanors arising out of a traffic accident. On 20 July 1986 while attending

a church service at the Allen County Courthouse, he escaped. Two days later he broke into a house near Franklin, Kentucky, from which he took a number of items, including a suitcase and a .410–gauge single-barrel shotgun. He sawed off the stock and barrel of the gun and carried it away in the suitcase. By 23 July 1986 he had made his way from Kentucky to an exit off Interstate 24 at Manchester, Tennessee, where he was endeavoring to steal an automobile. He happened upon Julie Guida as she was jogging in the area of the interstate exit. Guida was a 28–year–old mechanical engineer from Utah who was staying at the Manchester Holiday Inn while testing rocket engines at the nearby Arnold Engineering Development Center. He pulled the stolen shotgun on her and finally managed to subdue her after a struggle in which once she managed to knock the gun from his hand. Recovering the gun he attempted to assure her he was not going to kill her as he walked her into the nearby woods where he talked to her for awhile, telling her he was on the run and just wanted her to drive him to Chattanooga in her car. He used her shoelaces and the headphone cord from a portable radio tape player she was carrying to tie her to a tree. He used one of her socks as a gag to keep her from raising an alarm. He told her he was going to the Holiday Inn to retrieve her car, then he stepped behind her and, without warning, shot her once in the back of the head, killing her instantly.

After hiding her body under some brush and tree limbs, Bates went to Ms. Guida's motel room where he bathed, shaved and ate some fruit which he found there. He took some traveler's checks from her purse and departed in her rental car. He drove to Knoxville by way of Chattanooga and headed for Maryland, which was his home. Near Bristol, Tennessee he picked up a male and a female hitchhiker who assisted him in passing Guida's traveler's checks. On 26 July 1986 Bates was arrested on an unrelated offense in Baltimore, Maryland. A police investigation of Julie Guida's disappearance led Tennessee authorities to Maryland and then to the defendant.

Evidence presented at the suppression hearing indicated that on 20 August 1986 FBI agents investigating the interstate transportation of a stolen motor vehicle and the possible kidnapping of Ms. Guida interviewed defendant concerning his possession of Guida's car. He was properly advised of his right against self-incrimination, his right to counsel, and given an interrogation and advice of rights form. He informed the agents he understood his rights and refused to sign the form. The agents then questioned him concerning his involvement with Guida's car and traveler's checks. He was informed that several people had seen him driving the victim's automobile and when shown a photograph of Ms. Guida defendant told the agents, "I believe I need a lawyer." The interrogation stopped and defendant was returned to the jail. Nothing was done to afford him access to an attorney over the next thirteen (13) days.

On 2 September 1986 Tennessee Bureau of Investigation Agent Danny Wix and Frank Floied, an investigator for the Coffee County District Attorney's Office, proceeded to interrogate Bates. They had been informed by the FBI that the defendant had requested an attorney on August 20. Wix and Floied advised him of his rights, which he acknowledged he understood. No written waiver was presented for him to sign. Indicating they were interested in locating Julie Guida, Wix and Floied "interviewed" defendant about her disappearance and his activities after his escape from jail in Kentucky. The "interview" began at approximately 1:00 p.m. and continued until shortly after 6:00 p.m. when defendant gave his first statement.

Officer Floied, whose testimony was corroborated by Officer Willie Cole of the Baltimore Police Department, testified that when Bates was brought to the homicide interrogation room at the Baltimore Police Station he, Wix, Detective Cole and Detective Moore, all identified themselves. Bates was advised of his rights, stated he understood, and was asked if he wanted counsel. He said he did not want the services of an attorney. After their examina-

tion had gone on for some period of time he indicated he would like to speak with his brother, Gary Bates, before talking anymore. His brother was located and asked to come to the Central Police Station to talk with the defendant. He agreed to do so however, when he did not appear, they discovered he had gone to the city jail rather than the Central Police Station. Contacted by phone, he again agreed to come down, however, when he did not arrive, in another phone call they were informed by Pop Vincent, the uncle of Gary's wife, that he was not at home. Moore and Floied went to the Vincent residence where Gary lived. Mr. Vincent told them they were wasting their time that Gary would not be there. He had decided to leave, he had nothing to say to Wayne, that Wayne had been nothing but trouble for him. They returned to the police station and related this information to defendant. He did not believe this information and asked if he could call Mr. Vincent to confirm what the officers had said. The police placed the call and told Mr. Bates to pick up the receiver. There was a discussion between him and Mr. Vincent. After a matter of seconds he hung up the phone, turned to the officers and said "I'll tell you what happened. I didn't molest her. I didn't rape her. I didn't mutilate her. I just blew her ___ head off." Subsequently he drew a map for them so the body could be located. He then gave detailed statements which were admitted against him at the sentencing hearing.

Defendant's version of events which occurred prior to his confession was that after being interrogated by the FBI agents he was returned to the Baltimore City Jail and placed in a lock-up status. He endeavored to solicit assistance in obtaining an attorney through his social worker and his brother, all without success. He said when he was introduced to Wix and Floied he could tell from their conversation that they were aware he had previously requested assistance of counsel. When they began talking about murder and related matters he told them he wanted to talk to his brother, and said he believed he told them he needed an attorney. They responded that a lawyer could not help him and at his insistence they called his brother to come talk to him and bring him some clothes. By mistake his brother went to the Baltimore City Jail instead of the Central Police Station where the interrogation was taking place. When his brother did not appear the officers called his home again. Supposedly his wife's uncle answered the phone and then handed it to his brother who said he didn't want anything else to do with Bates, that he had been nothing but trouble, and that he didn't want to see him anymore. When this information was communicated to Bates, he requested they call again and let him talk to Mr. Vincent because he did not believe what he had been told. Vincent told him the same thing. He testified that after talking to the uncle he made the statement to the officers because "I didn't care about nothing no more." It was his testimony that his brother was his last link with his family because he had previously shot another brother. At the time he still wanted to talk to a lawyer but none had ever been provided for him.

The second statement was given to the FBI on 11 September 1986. Bates had still not consulted with an attorney. Agent Gerald Dougher of the FBI was collecting hair samples from defendant in accordance with an order from the Federal District Court in Roanoke, Virginia. As defendant was supplying the samples he told Dougher that he didn't understand why the FBI was doing this, because he had already admitted to the murder in Tennessee. Dougher explained that before he could discuss the homicide with defendant he would have to be advised of his constitutional rights and would have to sign a statement indicating he had initiated the conversation and specifically did not want an attorney present. Defendant agreed to do this, read the advice of rights form, and signed a waiver. He then gave the second statement introduced at sentencing. This statement in sum and substance tracked the one given earlier to Officers Wix and Floied.

The trial judge found both statements were admissible. He overruled the motion to suppress made by defendant. He found

that, considering the totality of the circumstances, the statement made by the defendant to agents Wix and Floied on 2 September 1986 after the telephone call to Mr. Vincent was not in response to police initiated custodial interrogation as prohibited by *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). That the statements made to the officers were a result of the accused initiating further communications, exchanges or conversations with the police after his telephone conversation with Mr. Vincent. He held that the statement was spontaneous and voluntary and that defendant had knowingly and intelligently relinquished his right to counsel. That his will was not overborne and his initial decision to talk to Agents Wix and Floied was consciously and voluntarily made by the defendant to satisfy his curiosity after adequate *Miranda* warnings, because he wanted to find out what they knew, and that was his only reason for talking to them at all. He further held that the statements of the defendant made subsequent to 2 September 1986 did not flow from an inadmissible confession and were not the unlawful fruit of the "poisonous tree" and were therefore not subject to suppression.

We are of the opinion the trial judge erred in his findings that the statements made by Bates to Officers Wix and Floied was a voluntary, knowing and intelligent relinquishment or abandonment of his right to have counsel present during custodial interrogation within the meaning of *Edwards,* supra.

The *Edwards* court at (101 S.Ct. at 1884) specifically said:

[A]lthough we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, see *North Carolina v. Butler, supra,* 441 U.S. [369] at 372–276, 99 S.Ct. [1755] at 1757–1759 [60 L.Ed.2d 286 (1979)] the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid

waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

\*　\*　\*　\*　\*　\*

In concluding that the fruits of the interrogation initiated by the police on January 20 could not be used against Edwards, we do not hold or imply that Edwards was powerless to countermand his election or that the authorities could in no event use any incriminating statements made by Edwards prior to his having access to counsel. Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial. The Fifth Amendment right identified in *Miranda* is the right to counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver. *Rhode Island v. Innis, supra,* makes this sufficiently clear. 446 U.S. [291] at 298, n. 2, 100 S.Ct. [1682] at 1688, n. 2 [64 L.Ed.2d 297 (1980)]. But this is not what the facts of this case show. Here, the officers conducting the interrogation on the evening of January 19 ceased interrogation when Edwards requested counsel as he had been advised he had the right to do. The Arizona Supreme Court was of the opinion that this was a sufficient invocation of his *Miranda* rights, and we are in accord. It is also clear that without making counsel available to Edwards, the police returned to him the next day. This was

not at his suggestion or request. Indeed, Edwards informed the detention officer that he did not want to talk to anyone. At the meeting, the detectives told Edwards that they wanted to talk to him and again advised him of his *Miranda* rights. Edwards stated that he would talk, but what prompted this action does not appear. He listened at his own request to part of the taped statement made by one of his alleged accomplices and then made an incriminating statement, which was used against him in his trial. We think it is clear that Edwards was subjected to custodial interrogation on January 20 within the meaning of *Rhode Island v. Innis, supra,* and that this occurred at the instance of the authorities. His statement made without having had access to counsel, did not amount to a valid waiver and hence was inadmissible.

The rule was reaffirmed in *Wyrick v. Fields,* 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982) and in *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983).

 It is undisputed that in this case the authorities elected to interrogate the defendant with full knowledge that he had preserved his Fifth Amendment right to counsel and that he had not been provided with the assistance of an attorney prior to the time of their interrogation. It is insisted that defendant's incriminating statement was initiated by him after interrogation had ceased, and was a direct result of his discovery that his family had essentially "washed their hands of him." In *Oregon v. Bradshaw, supra,* 103 S.Ct. at 2834, the court clearly spelled out the requirements imposed on the prosecution to indicate a waiver of the Fifth Amendment right to have counsel present during an interrogation. After the right to counsel has been asserted by an accused, even if a conversation is initiated by him after he has expressed his desire to deal with the police only through counsel, where re-interrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth

Amendment right to have counsel present during the interrogation. The State has failed to carry that burden in this case.

[4] The statement made by defendant to the FBI agents on 11 September 1986 presents an entirely different situation. Bates had still not seen an attorney in response to his request of 20 August. He was still in the custody of the Baltimore authorities for the violations he had committed in the City of Baltimore. The Federal Bureau of Investigation was working in conjunction with the United States Attorney's office in Roanoke, Virginia where defendant was being charged with interstate transportation of stolen property and a stolen motor vehicle. The record indicates this was the traveler's checks owned by Ms. Guida and the rental automobile which had been in her possession in Manchester, Tennessee. The Tennessee authorities were investigating Ms. Guida's disappearance and probable homicide.

It must be presumed that everybody's business is nobody's business and none of the three separate agencies assumed the responsibility for providing defendant with counsel. Nevertheless, on the above date FBI Agent Dougher was in the process of serving a court order on defendant requiring him to provide hair samples in conjunction with the federal charges pending against him in Roanoke. According to the officer, defendant was cooperative and provided head hair samples freely. During the process he initiated a conversation by saying, "I don't know why you need this; I've already admitted to the murder in Tennessee." Defendant complained they were endeavoring to stack charges against him and was informed that before the agents could discuss anything about the homicide with him, he would have to again be advised of his constitutional rights. He would have to provide a signed statement indicating he had initiated the conversation and specifically did not want an attorney present. He voluntarily, knowingly and understandingly gave a statement which, as we have noted, substantially followed that given to the Tennessee officers on an earlier date. There was no coercion in-

volved with the statement, and apparently no effort made to interrogate. Therefore, we find no error in the admission of defendant's confession to be used against him.

■ We have considered whether the error in admission of defendant's first confession into evidence was reversible pursuant to the harmless error requirement set forth in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Viewing the evidence as a whole, applying those standards, we are satisfied that admission of defendant's September 2nd statement was harmless beyond a reasonable doubt and there is no reasonable possibility that the evidence obtained contributed to his conviction. Most of the evidence in the case, with the exception of his actual admission to the homicide, was gathered by law enforcement officers during the course of their investigation of Ms. Guida's disappearance. Beginning with the first traveler's check, which was cashed in Abingdon, Virginia, defendant left a trail which led unerringly to him, up to and including his arrest, when he was found in possession of the vehicle she had leased on her fateful mission to Tennessee. Moreover, defendant made not two, but three statements. If we were to find that both of the statements to authorities were inadmissible as evidence against him, he would still have to overcome the unsolicited admission made by him to Paul Carter while both men were confined in the Coffee County Jail. This statement, while being somewhat abbreviated, included all of the essential elements of the two admissions made to the authorities. Defendant's sentencing hearing, including the voir dire of the jury, consumed approximately two weeks, during which the jury members had the opportunity to observe him, his mannerisms, actions and conduct in the courtroom. Our review of the record leaves us with no reasonable doubt that the jury would have reached the same verdict without having heard the admission made by him which we have held should have been excluded from the record. They also had the opportunity to hear the mitigating circumstances proffered by him in evidence at the hearing. The defendant received a fair trial without any constitutional entrenchment.

■ In reference to the procedural errors charged by the defendant, we find his complaint that there had been no election of a presiding judge in the Fourteenth Judicial District in accordance with T.C.A. § 16–2–510 to be without merit. This issue was considered in *State v. Thompson,* 768 S.W.2d 239, 245–46 (Tenn.1989) in which the court noted that the statute relied on is plainly a directive relative to the administrative duties of the judges within their judicial districts. It was enacted for the benefit of the public at large, not a particular accused, and in the absence of corruption, fraud, bias, disqualification, or other illegality affecting the grand jury any irregularity in its selection does not invalidate his acts.

Defendant questions the refusal of the trial court to grant a motion for change of venue, asserting that he was denied a fair and impartial trial in the jurisdiction where the crime was committed. The disappearance of Julie Guida, and subsequent arrest of the defendant, drew a considerable amount of publicity throughout the area where the offense occurred. Manchester, Tennessee is almost equi-distant between Chattanooga and Nashville, cities from which a good deal of the press and television publicity emanated. It is 69 miles from Chattanooga and 64 miles from Nashville. Less than a third of the news articles complained of were released within the local area, although there were subscribers to metropolitan newspapers in Coffee County, and the county is within the television reception area of those cities.

Rule 21 of the Tenn.R.Crim.P. provides that the venue may be changed upon motion of the defendant, if it appears to the court that, due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had.

■ Initially defendant argues that the publicity in this case requires application of the "presumed prejudice" standard followed by the United States Supreme Court in *Rideau v. Louisiana,* 373 U.S. 723, 83

S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); and *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). These cases involved extremely inflammatory publicity and media conduct creating a corruptive carnival atmosphere that deprived the proceedings of "the solemnity and sobriety" required for due process. They do not stand for the proposition that juror exposure to information about the crime and the defendant's prior convictions, which was primarily the type of publicity in the present case, is presumably prejudicial. *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). In *State v. Melson*, 638 S.W.2d 342, 360–361 (Tenn.1982), the Court reiterated the rule which applies in cases of this nature, that is, the decision of whether or not to change the venue is for the sound discretion of the trial court and may not be reversed on appeal absent a clear view of such discretion. There was no such abuse in this case.

▉ Defendant also asks us to consider the standards and factors embraced by the rule in the courts of this State to determine whether or not to grant a change of venue. In *State v. Hoover*, 594 S.W.2d 743, 746 (Tenn.Cr.App.1979) the court listed a group of seventeen (17) factors to be considered in determining whether to grant a change of venue. Among these are the nature, extent and timing of pretrial publicity. The record in this case clearly indicates that most of the potentially prejudicial publicity occurred in the Summer and Fall of 1986 sometime before the trial in May of 1987. Nearly all of the accounts related the facts of the events in the case in a fair and unsensational manner. Voir dire revealed that approximately seventy percent (70%) of the potential jurors had read or heard something about this case. However, the exposure of most of these individuals was not extensive. It is true that defendant exhausted his peremptory challenges in the jury selection, but he has failed to show that the twelve jurors who actually rendered the verdict were prejudiced by pretrial publicity or were not competent jurors. Their exposure to media

accounts and public discussion of the case range from nonexistent to moderate. All of those who had heard or seen some of the pretrial publicity stated they could set aside what they had heard or read and follow the law. In *Murphy v. Florida, supra*, 95 S.Ct. at 2035–36, quoting from *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) the court said:

> The constitutional standard of fairness requires that a defendant has "a panel of impartial, 'indifferent' jurors." ... Qualified jurors need not, however, be totally ignorant of the facts and issues involved.
>
> "To hold that the mere existence of an preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a perspective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

The judgment of the trial court as to the legal necessity of a change of venue in a criminal prosecution may be reversed. It will only be done in a strong case of error, apparent upon the record. See Tennessee Jurisprudence, 1985 Ed., Venue, § 11. We do not find any such error in this record.

Defendant charges the trial court with error during the voir dire of the jury by not excusing a number of potential jurors for cause and in requiring him to exercise his peremptory challenges to exclude a number who were opinionated in favor of the death penalty. He specifically points out juror, Michael Anderson, who he says had formed an expressed opinion, based on what he had read and heard, that the defendant, if guilty, should receive the death penalty. He then directs his complaint to a total of six (6) jurors, one of whom was Michael Anderson. He says these jurors, when voir dired, unequivocally expressed the opinion that, once it was established that the defendant had committed first degree murder, they would definitely impose the death sentence.

Relying on a number of older cases, from about the turn of the century, defendant argues that under Article I, § 9 of the Tennessee Constitution guaranteeing a defendant an "impartial jury," a juror having an opinion on the ultimate issue must be disqualified, even though he expresses the belief he can divest himself of his convictions and render a fair and impartial verdict. We do not believe these cases are apropos. They are based on different reasoning which is not applicable in this case. Rule 24(b)(2), Tenn.R.Crim.P., provides that if a prospective juror "admits to having formed an opinion, he shall be subject to challenge for cause unless the examination shows unequivocally that he can be impartial." The determination of impartiality must be made in the trial court's discretion. *State v. Sammons*, 656 S.W.2d 862, 869 (Tenn.Cr.App.1982).

Among the jurors who defendant challenged as biased, Lawrence Cooper, was excused for cause, on grounds other than raised in this issue. An examination of the voir dire of these prospective jurors discloses that although they stated the death penalty to be the appropriate punishment for any first degree murder, these were, at best, statements of opinion made without knowledge of the law. Each of these prospective jurors made it clear that he or she would follow the law and consider all of the evidence and the factors relevant to sentencing before reaching a decision. Beyond that, none of these prospective jurors were forced upon defendant at trial and there is no claim that the jury who heard the case was not fair and impartial. See *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989).

Defendant insists the trial court erred in allowing the jury to see a video tape of the remains of the victim, showing a close-up view of the skeleton and removal of the skull from the body. He also protests the admission of photographs which he says shows the "grossly stained, discolored and maggot-infested clothing of the victim and a mat of hair from the skull." He argues vigorously that the video tape and the photographs were irrelevant and unduly prejudicial and inflammatory. He relies on this Court's opinion in the case of *State v. Banks*, 564 S.W.2d 947 (Tenn.1978) to sustain his objection.

Over defendant's objection the State was allowed to introduce into evidence an edited video tape showing the crime scene, and the victim's remains, at the time the body was discovered. Approximately eighty percent (80%) of the video tape is devoted to showing the wooded area where the crime occurred and the location and condition of various items found, there such as the victim's shoes and the murder weapon. The tape clearly depicts the way the defendant hid the body under a pile of logs, brush, etc. The part of the tape objected to, shows, quite clearly, the victim's skull and rib cage. The bones are clean and all that remains is the skeleton. At the end of the tape Dr. William Bass, an anthropologist from the University of Tennessee is seen taking the skull from the body and removing matter from it. Part of the skull falls away, and the mass of damage done to the back of the skull is revealed. The portion of the video tape showing the victim's remains and their removal was, if not completely irrelevant to any issue, totally unnecessary and cumulative to other less potentially prejudicial proof. Nonetheless, what is shown is not particularly gruesome and does not appear to be so prejudicial and inflammatory as to call into question the reliability of the sentencing proceeding so as to warrant reversal. Two photographs are in evidence. One shows a mass of what appears to be matted black hair and otherwise is not identifiable. The other shows a picture of the victim's tank top which may also include other items of her attire. As stated by the defendant the items depicted in the photograph are stained and discolored from some source. Dr. Bass testified that objects on the tank top were fly larvae or maggots. The photographs are neither gruesome nor inflammatory.

In *Banks, supra,* this Court approved Federal Rules of Evidence 401 and 403 to

be utilized as a proper guide to be followed by our courts in both criminal and civil cases.[1] Rule 401 defines relevant evidence as that having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Rule 403 provides that although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Our examination of the record, and scrutiny of the video tape and photographs, convinces us that their admission did not affect the results of the trial. The record clearly indicates that this was a brutal, wanton homicide committed for the sole purpose of enabling defendant to complete his escape from confinement for other offenses committed by him previously. The record fully sustains and supports the severity of the sentence.

Defendant complains of the admission of the testimony of Marvin Littleton, Reginal Hendricks and Lee Rose, all of whom testified to events which occurred after the murder of Julie Guida.

Littleton was one of two hitchhikers picked up by defendant as he drove the victim's car from Knoxville to Baltimore. He testified about how he and his companion, Francine Kelman, helped defendant cash the stolen traveler's checks. After they arrived in Baltimore defendant abandoned them, taking their luggage with him. Defendant objected to this testimony as immaterial to the facts and circumstances of the crime.

Littleton's testimony provided facts relevant to the crime and background of the case. *See State v. Teague,* 680 S.W.2d 785, 788 (Tenn.1984). The evidence was also relevant to sentencing, establishing, as it did, that the defendant was in possession of the victim's property shortly after her death. It was admissible to prove the aggravating circumstance in T.C.A. § 39–2–203(i)(7)—murder committed while defendant was engaged in committing robbery or larceny. Although it was offered in the State's case in chief, evidence of his behavior shortly after the homicide would have been admissible in rebuttal to mitigating evidence that defendant was suffering from a mental disease or defect, or extreme mental or emotional distress at the time of the offense. Therefore the admission of the evidence beforehand was wholly harmless.

Defendant objected to the testimony of Officer Reginal Hendricks on the basis that it was irrelevant to sentencing. Hendricks testified how defendant, who smelled of alcohol when stopped while driving the victim's car, led the police on a reckless, high-speed chase through the streets of Baltimore until he crashed the car into a light pole. Defendant continued to flee on foot through a housing project populated largely by blacks and, when apprehended, behaved violently and made racial remarks to the crowd observing his arrest. He gave the officers his brother's name instead of his own when he was booked. Most of the foregoing testimony was admissible background evidence as well as proof establishing larceny of the automobile as an aggravating circumstance. Some details of his flight and capture, such as almost provoking a race riot, were less relevant and had the potential for prejudice. However, in light of the strength of the State's case against him this was not reversible error.

Lee Rose, a guard at the Coffee County Jail, testified on direct in the State's case that while defendant was incarcerated in the jail in October 1986 he removed the handles and bracket from a garbage can and hid them near his cell. When asked why he had done this, defendant said he was going to use them to kill one of the guards. The court admitted this

---

1. Effective 1 January 1990 the court adopted Tennessee Rules of Evidence which trace Federal Rules 401 and 403 verbatim.

testimony as relevant to defendant's character. Defendant argues that this testimony was clearly designed to inflame and improperly prejudice the jury by endeavoring to show that, after the murder, he had attempted to fashion a weapon with which to kill a guard at the jail. He says this testimony was wholly unrelated to any of the three aggravating circumstances relied on by the State.

We are of the opinion that the evidence related to mitigating circumstances raised by the defendant. It is true that the evidence was offered prematurely, however, the timing of the admission of the evidence does not effect its admissibility as evidence rebutting the defendant's mitigating proof. In his opening argument, defense counsel informed the jury of the intent to prove that the defendant was under the influence of extreme mental or emotional disturbance at the time of the homicide. This Court has emphasized in *Cozzolino v. State*, 584 S.W.2d 765, 768 (Tenn.1979), and subsequent cases, that in enacting T.C.A. § 39–2–203(c) [now T.C.A. § 39–13–203(c)] that the Legislature intended that irrelevant evidence not be placed before the jury, fraught as such a procedure would be with the "substantial risk that [the death penalty] would be inflicted in an arbitrary or capricious manner," *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). We have held that under the statute evidence is relative to punishment, and thus admissible, only if it is relevant to an aggravating circumstance, or to a mitigating factor raised by the defendant. The defendant introduced expert evidence and institutional records to convey to the jury that he was laboring under a psychological condition which created an extreme mental or emotional disturbance at the time he committed the murder. The State was impelled to introduce proof in rebuttal to that defense, including proof of bad institutional behavior, to demonstrate that he was a person who would turn to violence in an effort to obtain his way, rather than a person who committed violent acts because he was under the influence of extreme mental or emotional disturbance. There was no error.

Defendant says the trial court erred in the admission of evidence of a prior escape conviction and a prior assault and battery conviction. One of the aggravating circumstances relied on by the State was that defendant was previously convicted of one of more felonies, other than the present charge, which involved the use or threat of violence to the person. Pursuant to a stipulation the State presented proof of three prior felony convictions of the defendant, all from the State of Maryland: (1) A 1977 conviction for robbery with a dangerous and deadly weapon; (2) a 1982 conviction for assault and battery upon a Department of Corrections employee; and (3) a 1980 conviction for felony escape. There was no trial objection on behalf of defendant to the admission of this evidence. Further, it does not appear that this issue was raised on the motion for new trial. Moreover, defendant stipulated to the past convictions and the sentences imposed. If he objected to this information being introduced into evidence he should not have agreed to the sentences being made a part of the record. *State v. Williams*, 657 S.W.2d 405, 414 (Tenn.1983). Robbery with a dangerous and deadly weapon and assault and battery upon a Corrections Department employee are both felonies involving the use or threat of violence to the person and as such were relevant to the aggravating circumstance set forth in T.C.A. § 39–2–203(i)(2). The escape conviction did not qualify without some proof of the use of violence or threat of violence in the commission of the felony. In light of the proof and the court's instruction that only the robbery and assault convictions should be considered in connection with the aggravating circumstance, the error was totally harmless.

Defendant complains of a number of instances of conduct by the prosecutor which he says were improper and prejudicial. He refers first to several remarks, all but one made during argument, directed to or commenting about defense counsel. Once when counsel objected to testimony by Dr. Marshall, a State witness, the prosecutor remarked that defense counsel was

"becoming paranoid." The remark was a personal reference to counsel and should not have been made. There were other remarks made by the District Attorney General, or his assistant, which were not objected to. Defense counsel did object to two comments by the prosecutor to the effect that when the argument "gets next to [defense counsel], they stand up and object," and "[o]f course, [defense counsel] are going to object. They don't want you to hear it again." On both occasions the trial court correctly sustained the objections and gave curative instructions to the jury. Several instances of improper argument were pointed out when the prosecutors indicated their opinions on whether they believed or did not believe, or agree with certain facts or theories. Generally there was no objection to these remarks. At one point the defense objected and the prosecutor explained to the jury that, when he said "I believe" he meant he was arguing "based on the proof in this case and testimony ... from the witness stand." Another time the prosecutor was admonished by the court not to "inject" his personal opinion into the argument noting that the argument was actually one of theory. He instructed the jurors to disregard the attorney's beliefs. It appears from an examination of the record that most of the other prosecutorial statements of which defendant complains on this issue, appear to be somewhat inartful argument of theory.

 During argument the prosecutor twice referred to the defendant as a "rabid dog." No objection was made to these remarks, which were patently improper. See State v. Tyson, 603 S.W.2d 748, 754 (Tenn.Cr.App.1980); Bishop v. State, 582 S.W.2d 86, 91 (Tenn.Cr.App. 1979); Armstrong v. State, 3 Tenn.Cr.App. 505, 464 S.W.2d 312, 315 (1970). In another instance the prosecutor made an improper remark at the conclusion of the direct examination of defendant's mother, who was crying by the end of her testimony. Defense counsel requested a few minutes for Mrs. Bates to compose herself before commencing cross-examination, the prosecutor said, "after a performance like that, I can understand why." Such a remark was indefensible.

Finally, the record shows the State made three unsuccessful attempts to get before the jury testimony concerning background information about the victim, despite the fact that the court had repeatedly sustained objections to the evidence because it was irrelevant.

 It was clearly improper for the State's counsel to make the comments which they did. Likewise, the name-calling was inappropriate and certainly uncalled for. However, considering the nature of the crime involved and all the facts surrounding the homicide, we have concluded that the improper conduct in closing argument by the State's lawyers did not affect the verdict to the prejudice of defendant, and did not warrant reversal of the conviction. However, they might be well advised to adhere more rigidly to the disciplinary rules promulgated by the court for the conduct of counsel at trial.

 Defendant raises the issue of the Attorney General's argument that if defendant was given a life sentence, he would pose a danger to prison guards or corrections officials, or pose a danger to members of the general public if he were to escape.

The prosecuting attorney's closing argument did stress the theme that the jury should vote for the death penalty because of the possible danger in the future that if defendant was not sentenced to death he would kill again either while in prison or after an escape. The United States Constitution does not preclude a capital sentencing jury from considering the future dangerousness of a particular defendant where such is a relevant factor under a State's law of capital sentencing. See Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 3453, 77 L.Ed.2d 1171 (1983); Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 3163, 82 L.Ed.2d 340 (1984). Generally, in Tennessee the issue of specific deterrence should be avoided by the State in closing argument at a capital sentencing hearing.

*State v. Irick*, 762 S.W.2d 121, 131 (Tenn. 1988). Such argument is usually irrelevant to the aggravating circumstances listed in Tennessee's statute; and unless relevant to some theory raised by the States proof, or the defense, it interjects an element into the jury's considerations not provided for by the law. *See State v. Hines*, 758 S.W.2d 515, 520 (Tenn.1988). We reiterate the admonition made in *Cozzolino, supra,* that evidence is relative to the punishment, and thus admissible, only if it is relevant to an aggravating circumstance, or to a mitigating factor raised by the defendant. In this case the defense was molded around the theory that a life sentence was appropriate because the defendant was mentally disturbed to a degree that it lessened his culpability, and he would be confined for the rest of his nature life. There was also evidence and argument that he was amenable to treatment and rehabilitation. In *California v. Ramos*, supra 103 S.Ct. at p. 3454, the Supreme Court made it clear that it was part of the jury's function to focus on probable future dangerousness of a defendant including defendant's potential for reform and whether his probable future behavior counsels against the desirability of his release into society. The State's argument was in direct response to defendant's mitigating theory and was not improper under the circumstances of this case.

▬ Defendant insists that the evidence is insufficient to support the verdict if the court excludes, what is referred to as, improperly admitted evidence. We have spoken specifically to each of the items of evidence which defendant contends were improperly admitted as well as the allegations of improper conduct and comments of the Attorney General and found none of these, either separately or cumulatively, to warrant reversal. The proof supports three aggravating circumstances: (1) that defendant had prior convictions for armed robbery and assault and battery, both considered as felonies involving the use or threat of violence; (2) that the victim was killed so that defendant would not run the risk of being arrested and prosecuted for the charges facing him in Kentucky, and

for the theft of her car; and (3) that the murder was committed while defendant was engaged in committing the kidnapping and robbery of Julie Guida, the burglary of her motel room, and larceny of her car and traveler's checks.

The mitigating circumstances relied upon by defendant were: (1) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance; (2) defendant acted under extreme duress or under the substantial influence of another person; (3) the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment.

Defendant submitted all of these circumstances to the jury which rejected these theories of defense. Under the proof in this record, and the correct and proper instructions conveyed to the jury by the trial judge, the evidence supports the jury's finding of no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances found.

Defendant says there is a substantial probability that the jurors in this case believed they could not consider any mitigating circumstance unless they unanimously agreed on its existence, in violation of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

This Court has recently considered this issue in *State v. Thompson*, 768 S.W.2d 239, 250–251 (Tenn.1989) the Court concluded:

"T.C.A. § 39–2–203 places no evidentiary hurdle in the way of establishing mitigating facts; nor does it assign any standard for weighing mitigation against the aggravating circumstances. Each juror has discretion to determine the degree to which the proof mitigates against the death penalty, and whether it is 'sufficiently substantial' to call for a lesser

sentence. T.C.A. § 39–2–203(g)(2) and § 39–2–205(c)(3)."

As in *Thompson,* we are satisfied that nothing in the Tennessee statutes, in the instructions given to the jury, or in the verdict form submitted to the jury, was likely to lead any juror to believe that he or she was precluded from considering mitigating circumstances unless all jurors agreed that circumstance existed.

We have reviewed these proceedings in accordance with the mandate of T.C.A. § 39–2–205 and find that the sentence of death was not imposed in an arbitrary fashion. The evidence supports the jury's findings of three statutory aggravating circumstances and the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances found. We have considered the facts and circumstances of the defendant as well as the offense and hold that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases.

The sentence of death will be carried out as provided by law on the 11th day of March, 1991, unless otherwise ordered by this Court or by other proper authority. The sentence for grand larceny is affirmed. Costs are assessed against the defendant.

DROWOTA, C.J., and FONES, COOPER and HARBISON, JJ., concur.

## ORDER ON PETITION TO REHEAR

A respectful petition to rehear has been filed on behalf of defendant, invoking various provisions of the Constitution of Tennessee and citing numerous court decisions in support of its solicitation to have the case resubmitted and reargued before the presently sitting Court, the members of which were sworn into office on 4 September 1990.

The petition to rehear does not meet the requirements of T.R.A.P. 39.

The unanimous opinion of this Court in the case was filed on 14 January 1991. It is contended that the term of office of three of the Justices before whom the case was submitted and argued had expired prior to the date the opinion of the Court was filed and judgment entered, therefore these Justices were functus officio and without power to act.

On 27 August 1990 the Chief Justice of this Court, under the auspices of Art. VI, Secs. 2, 3 and 11 of the State Constitution and T.C.A. § 16–3–502, designated each of the three Justices whose qualifications are questioned, to sit and act after August 31, 1990, as a Special Justice of the Supreme Court for the purpose of completing the work on all pending cases in which they had been a participant.

Defendant has been accorded every trial right guaranteed to him under either the State or Federal Constitution. These guarantees do not include a right to appellate review. *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983); *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956). Although, when a State does grant appellate review the Due Process and Equal Protection Clause protect a defendant from invidious discrimination, *see Griffin,* supra, 76 S.Ct. at 590; *State v. Wilson,* 530 S.W.2d 766, 769 (Tenn.1975), there has been no such discrimination in this case.

The request that this petition to rehear be submitted to and considered by the newly-elected Court which took office on 4 September 1990 is also without merit. Three members of the presently sitting Court have not previously participated in consideration of the case and are therefore not lawfully competent to act in any capacity in its review.

The issue concerning the admission of defendant's confessions has been considered and found to be without merit.

The petition to rehear is denied.

DROWOTA, C.J., and COOPER and HARBISON, JJ., concur.

FONES, J., not participating.