IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

OCTOBER 1998 SESSION

FILED

December 21, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | C.C.A. NO. 02C01-9710-CC-00416 |
| Appellee, | ) | |
| | ) | FAYETTE COUNTY |
| VS. | ) | |
| | ) | HON. JON KERRY BLACKWOOD, |
| STACY D. WILLIFORD, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (Aggravated Vehicular Homicide, Vehicular Assault, Driving Under the Influence, Driving on Revoked License, and Leaving the Scene of an Accident) |

FOR THE APPELLANT:                    FOR THE APPELLEE:


**ANDREW S. JOHNSTON**            **JOHN KNOX WALKUP**
108 East Court Square               Attorney General & Reporter
Somerville, TN  38068

                                    **PETER M. COUGHLAN**
                                    Asst. Attorney General
                                    John Sevier Bldg.
                                    425 Fifth Ave., North
                                    Nashville, TN  37243-0493

                                    **ELIZABETH T. RICE**
                                    District Attorney General
                                    302 Market St.
                                    Somerville, TN  38068

OPINION FILED:_____


**AFFIRMED**


**JOHN H. PEAY,**
Judge

**O P I N I O N**

The defendant was convicted by a jury of aggravated vehicular homicide, vehicular assault, driving under the influence, driving on a revoked license, and leaving the scene of an accident. Following a sentencing hearing, the defendant received an effective sentence of twenty years. The defendant now appeals, raising the following issues for review:

> I. Whether the trial court erred in denying the defendant's motion to suppress statements on the theory the defendant was in custody but was not read his Miranda warnings?
>
> II. Whether the defendant's due process rights were violated by T.C.A. § 55-10-401, which allows an inference that previous DUI offenders are intoxicated if their blood alcohol content is .08% or higher, whereas it may be inferred that first-time offenders are intoxicated only when their blood alcohol content is .10% or higher?
>
> III. Whether the trial court erred in charging the jury that they could infer intoxication by a .08% or higher blood alcohol content, since this instruction reveals to the jury that the defendant has been previously convicted of DUI?
>
> IV. Whether the evidence is sufficient to sustain the defendant's convictions for aggravated vehicular homicide, vehicular assault, and leaving the scene of an accident?

Finding no reversible error, we affirm the trial court's judgments.

Around 6:50 p.m. on October 10, 1996, Annette Pittman and her young daughter were traveling between forty-five and fifty miles per hour on Bateman Road in Fayette County, headed north toward Highway 57. As Ms. Pittman crested a hill, her young daughter's yell alerted her to a motorbike, without any lighting, driving approximately fifteen miles per hour weaving in the middle of the lane. Two boys in their early teens were riding the motorbike, but neither looked back when Ms. Pittman's headlights illuminated them, even though her car came within five to six feet of hitting them. She followed them at a distance, and when she came to a safe place to pass

them, she did.

Approximately fifteen minutes later, at around 7:05 p.m., the defendant was driving his Camaro westbound on Highway 57. The speed the defendant was traveling is unknown. The night was dark and clear, there were no street lights but nothing to obstruct a driver's view, and the pavement was dry. The defendant struck two boys, Ronald Phillip Webb and Brandon Robbins, who were riding a motorbike traveling between fifteen to thirty miles per hour[1] westbound approximately one to three feet inside the pavement's white line. The motorbike became wedged underneath the defendant's car and the boys were thrown fifteen to twenty feet from the road. The collision left no skid marks on the road.

The defendant continued driving. A man driving eastbound on Highway 57 passed the defendant's Camaro after the collision, noticed the motorbike lodged under the Camaro's body, and smelled antifreeze and burning rubber. According to the man, the defendant was traveling at a "normal highway speed, maybe faster" and without any headlights. The record is silent as to whether the defendant's headlights were on at the time of the collision. It is also unknown how fast the defendant was traveling at the time of the collision.

The defendant drove to his mother's house, which was one mile from the scene of the collision. Because the motorbike remained lodged under the Camaro, the motorbike's tire left a mark as it dragged on the road from the point of impact to the defendant's mother's house. At his mother's house, at 7:14 p.m., the defendant called 911. He returned to the scene by 7:55 p.m. driven by a friend in another car; he left his

---

[1]Robbins first testified they were traveling approximately 20 to 30 m.p.h. at the time of the collision, but then he agreed that they were traveling approximately the same speed on Highway 57 as they had been on Bateman Road, which another witness testified was approximately 15 m.p.h.

Camaro, with the dirt bike lodged still underneath of it, at his mother's house.

Trooper Perkins of the Tennessee Highway Patrol arrived on the scene at 7:35 p.m., approximately half an hour after the collision occurred. Trooper Perkins did not see the defendant at the scene until approximately 7:50 or 7:55 p.m. The defendant was very emotional, appeared to be upset, and began to cry. He told Trooper Perkins that he was the driver of the car that hit the motorbike. He said he did not see anything, but he felt and heard a "thug" and decided to continue driving to his mother's house. He admitted he had had a couple of beers earlier that day. A records search revealed that the defendant's driver license had been suspended.

Upon request, the defendant submitted to a blood test. The paramedic who administered the blood test observed the defendant's demeanor as very scared, afraid, and nervous. The defendant did not appear to the paramedic to be intoxicated, but the paramedic admitted that there have been previous times when he mistakenly thought a patient was not drunk. At least one police officer at the scene smelled alcohol on the defendant's person and believed the defendant "was obviously under the influence." The defendant's blood test later revealed a blood alcohol content of .16%.

Webb, who was fifteen years old at the time of the collision, died from multiple injuries sustained in the collision. His toxicology screen was negative for alcohol or drug use. Robbins, thirteen years old at the time of the collision, was severely injured in the collision. Robbins, who did not have a license to operate the motorbike on public roads, was operating the motorbike at the time of the collision; Webb was sitting behind him. At trial, Robbins admitted they had driven north on Bateman Road toward Highway 57, and then were headed westbound on Highway 57 when the collision occurred.

4

A local police officer had warned the boys one to two months prior to the collision about the dangerous manner in which they were riding the motorbike because they were causing cars to weave in order to avoid them. The local police had also previously warned the boys not to ride their bike on the city streets because the bike was not equipped with proper turn signals, a windshield, or a license plate and the brake lights were not working.[2] Robbins admitted that the reason they were traveling so slowly that evening was because they were having mechanical problems with the motorbike, but he insisted that the motorbike's headlight and taillight were working.

At trial, there was evidence suggesting the boys might have used marijuana prior to the collision. A seventeen-year-old friend of Robbins testified that Robbins had told her he and Webb had been smoking marijuana prior to the collision and was "high" at the time of the collision. She admitted she had known this information for nine months and could not explain why she decided three days prior to trial to disclose the information to the defense attorney but not the state attorney or any law enforcement officer. She also admitted she knew the defendant, but she insisted she did not know him well. Robbins denied using any drugs or alcohol that afternoon, and he denied telling anyone he had used marijuana and was afraid his parents would find out. Robbins also denied that he had rolling papers on his person at the time of the collision, but a local police officer found rolling papers near him after the collision. Robbins was not subjected to a drug or alcohol test because Trooper Perkins was not aware rolling papers were found at the collision scene.

First, the defendant argues that the trial court erred in failing to suppress the statements he made to Trooper Perkins at the collision scene because he was in

---

[2]The chief of the local police testified that he had previously checked the motorbike's brake lights and discovered they were not working, although he admitted he did not know whether that problem had been repaired prior to the collision.

custody but was not advised of his <u>Miranda</u> rights. The defendant also contends that the results of his blood alcohol test should have been suppressed since the only grounds for administering the test under T.C.A. § 55-10-406(a)(1) was the defendant's statement to Trooper Perkins.

<u>Miranda v. Arizona</u> bars the admission of any statements elicited from a defendant through police-initiated custodial interrogation unless the defendant, prior to making the statement, was warned of certain rights and knowingly waived those rights. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); <u>see, e.g.</u>, <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981); <u>State v. Huddleston</u>, 924 S.W.2d 666, 669 (Tenn. 1996); <u>State v. Bates</u>, 804 S.W.2d 868 (Tenn. 1991). "Custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Miranda</u>, 384 U.S. at 444. In other words, <u>Miranda</u> warnings are required when a suspect has been formally arrested or when his or her freedom of movement has been restrained to the degree associated with a formal arrest. <u>California v. Beheler</u>, 463 U.S. 1121 (1983); <u>State v. Cooper</u>, 912 S.W.2d 756 (Tenn. Crim. App. 1995).

In assessing whether an individual is "in custody," the totality of the circumstances must be examined to determine whether a reasonable person would consider his or her freedom of movement restrained to the degree associated with formal arrest. <u>State v. Anderson</u>, 937 S.W.2d 851 (Tenn. 1996). Factors relevant to this determination include the following:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's

6

suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Id. at 855. Contrary to the defendant's suggestion, it is immaterial that "the trooper knew that he was dealing with an individual that he would likely charge with a crime" since a defendant's Fifth Amendment rights are no longer triggered by the defendant being the investigation's focus. See, e.g., Stansbury v. California, 511 U.S. 318 (1994); see also Anderson, 937 S.W.2d at 854; Cooper, 912 S.W.2d at 766.

Here, Trooper Perkins arrived at the scene approximately one-half hour after the collision occurred. Approximately twenty minutes later, the defendant voluntarily returned to the scene, approached Trooper Perkins, and disclosed to him he was the driver of the car involved in the collision. Trooper Perkins asked the defendant to wait a few minutes by his patrol car while he finished identifying the victims and notifying their parents. The defendant was not handcuffed, placed in the back of the patrol car, escorted or guarded by another police officer, or otherwise restrained. Approximately fifteen minutes later, Trooper Perkins approached the defendant and began questioning him about what happened. The record does not indicate that any officer other than Trooper Perkins was involved in the questioning of the defendant, nor does it indicate that either party became belligerent or confrontational during the questioning. The defendant stated he did not see anything, but heard a "thug" noise. When asked, he also stated he had been drinking alcohol. Trooper Perkins asked him one time to submit to a blood test, telling him he was not required to consent, but the defendant agreed to the test. The defendant was not advised of his Miranda rights. At no time, however, was the defendant told he must remain at the scene, answer questions, or submit to a blood test. In fact, according to the defendant's testimony at the suppression hearing, the defendant had returned to the scene voluntarily to give his account of the incident; he testified he had no problem waiting until Trooper Perkins could question him. After the questioning

7

concluded, the defendant went home.

Considering the totality of these circumstances, the defendant was not in custody at the time he answered Trooper Perkins' questions. Because Miranda warnings are constitutionally required only where a defendant is subjected to police-initiated custodial interrogation, there was no basis to suppress the defendant's statements to Trooper Perkins. See Stansbury, 511 U.S. at 318; Anderson, 937 S.W.2d at 854.

The defendant also contends that his blood test results should have been suppressed. The defendant relies upon T.C.A. § 55-10-406 for the proposition that a police officer must have "reasonable grounds to believe" that a defendant was driving under the influence of an intoxicant before requesting a blood test. According to the defendant, the only "reasonable grounds" Trooper Perkins had was his statement he had been drinking beer earlier that day, which he contends was obtained in violation of the Fifth Amendment and thus cannot serve as a proper basis for requesting a blood test under § 55-10-406. Even assuming the defendant's interpretation is correct, his argument is moot since we have concluded that the defendant's Fifth Amendment rights were not violated and the evidence shows the defendant consented to the blood rest.

Next, the defendant challenges T.C.A. § 55-10-408(b), claiming that a jury instruction pursuant to § 55-10-408(b) violated his constitutional right to due process of law. DUI is proven by a showing that a person was in physical control of a motor vehicle on a public road or any premises frequented by the public while "(1) Under the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system; or (2) The alcohol concentration in such person's blood or breath is ten-hundredths of one percent (.10%) or more." T.C.A. § 55-10-401(a)(1)-(2) (Supp. 1996). Generally, for the purpose of proving intoxication under § 55-10-401(a)(1), it may

8

be inferred that a defendant's ability to drive was sufficiently impaired if his or her blood alcohol content was .10% or higher. T.C.A. § 55-10-408(a) (Supp. 1996). If the defendant has at least one previous DUI conviction, however, a .08% blood alcohol content is sufficient to infer intoxication and impaired ability to drive, in violation of § 55-10-401(a)(1). T.C.A. § 55-10-408(b) (Supp. 1996).

In this case, the trial court instructed the jury, pursuant to § 55-10-408(b), as follows: "Evidence from the test that there was at the time alleged eight-hundredths of one percent or .08 or more by weight of alcohol in the defendant's blood creates an inference that defendant was under the influence of such intoxicant, and that his ability to drive was impaired." The defendant argues that this instruction violated his constitutional right to due process and that § 55-10-408 creates disparate treatment of previously convicted DUI offenders, whose intoxication may be inferred at .08%, as compared to first-time DUI offenders, whose intoxication may be inferred only after reaching .10%. The defendant's challenge to the constitutionality of § 55-10-408(b) must fail, however, as the defendant lacks standing. Because the defendant's blood test result was a .16%, the jury would have been entitled to infer the defendant was intoxicated under the higher .10% standard of § 55-10-408(a), regardless of the existence of a lower .08% standard for previous DUI offenders under § 55-10-408(b). In other words, even if the trial court had not instructed the jury on the .08% inference pursuant to § 55-10-408(b) and even if there were no disparity between the inferences for first-time DUI offenders and previous DUI offenders, the jury would still have been entitled to infer that the defendant was intoxicated because his blood alcohol content exceeded the higher .10% level. Because it cannot be said that the .08% inference under § 55-10-408(b) operated to deprive the defendant of his rights, the defendant lacks standing to challenge its constitutionality. See State v. Purkey, 689 S.W.2d 196 (Tenn. Crim. App. 1984).

9

The defendant also argues that the trial court's instruction on the .08% inference constituted reversible error because it "revealed to a knowledgeable juror(s) that the [defendant] had been convicted of prior DUI's [sic] and . . . put said juror(s) on notice of evidence that would otherwise be inadmissible at trial." The jury instruction pursuant to § 55-10-408(b) advised the jury it could infer intoxication and that the defendant's ability to drive was impaired from evidence of a blood alcohol content of .08% or higher. As far as the jury was instructed, the only purpose of the .08% standard was to infer intoxication and impaired ability to drive and nothing else. The jury was not instructed that the .08% standard applies only to defendants previously convicted of DUI or that the defendant in this case had been previously convicted of DUI. The defendant does not identify any "knowledgeable jurors" or even contend that any of the jurors in this case were "knowledgeable."

In the absence of evidence to the contrary, a jury is presumed to follow the instructions given to it. State v. Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985). Just as a jury may be presented with evidence of a defendant's prior bad acts and be instructed that they are to consider that information only as it relates to motive or intent or some other admissible purpose, we must assume that the jury in this case used the .08% standard for nothing more than to infer the defendant's intoxication and impaired ability to drive, rather than to speculate whether the defendant might have been previously convicted of DUI and allow that speculation to affect their verdict in this case. Thus, we must conclude that the trial court did not err in instructing the jury pursuant to § 55-10-408(b), a valid statute, as it is required to do. Even if error occurred, it would be harmless because the jury could have inferred that the defendant, who had a .16% blood alcohol content, was intoxicated even under the .10% standard for first-time offenders in § 55-10-408(a). Tenn. R. Crim. P. 52(a)(only errors affecting the result of trial on the merits may constitute reversible error).

Finally, the defendant challenges the sufficiency of the evidence, arguing it is insufficient to sustain his convictions for aggravated vehicular homicide, vehicular assault, and leaving the scene of an accident.

As it pertains to the charges in this case, aggravated vehicular homicide is the reckless killing of another as the proximate result of the driver's intoxication while operating a vehicle. T.C.A. § 39-13-213(a)(2). Similarly, vehicular assault occurs when a person causes serious bodily injury to another as the proximate result of his or her intoxication while operating a vehicle. T.C.A. § 39-13-106(a). The defendant contends that due to the boys' actions in operating the motorbike on the road under dangerous conditions when they had previously been warned not to do so, the death and the injury that occurred in the collision were not a proximate result of his intoxication. Rather, the defendant argues that most of the factors that caused the collision were "brought to bear by the victims themselves." As the State points out, however, Ms. Pittman had encountered the boys on the street only minutes before the defendant struck the boys. The circumstances under which Ms. Pittman encountered the boys were similar to the circumstances under which the defendant encountered the boys, with one notable exception: Ms. Pittman was not drunk, while the defendant had a blood alcohol content of .16%. Because Ms. Pittman, who was not drinking, was able to avoid a collision while the defendant, who was drinking, was not, the evidence was sufficient for the jury to conclude that the defendant's intoxication was the proximate cause of the collision that killed Webb and injured Robbins.

The defendant also contends that regardless of the .16% result from the blood test taken approximately one hour after the collision, there was no proof he "had consumed any alcohol or had any alcohol in his blood at the time of the subject accident." To the contrary, the defendant admitted to Trooper Perkins that he had consumed two

11

beers prior to the collision. Moreover, given that there was no evidence that the defendant consumed alcohol after the collision but before the blood test, the .16% blood alcohol content, coupled with the defendant's admission of drinking prior to the collision, was sufficient proof from which the jury could infer that the defendant was under the influence of alcohol at the time the collision occurred.

With regard to the defendant's challenge to his conviction for leaving the scene of the accident under T.C.A. § 55-10-101, the defendant contends that because he left the scene only to call 911 and then returned "forthwith," his actions did not violate § 55-10-101. The record shows otherwise.

Section 55-10-101(a) provides that drivers of vehicles involved in accidents resulting in injury or death "shall immediately stop such vehicle at the scene of such accident or as close thereto as possible, but shall then forthwith return to and in every event shall remain at the scene of the accident until the driver has fulfilled the requirements of § 55-10-103." Section 55-10-103(a) requires drivers to provide identifying information to other drivers involved in the collision and "render to any person injured in such accident reasonable assistance." T.C.A. § 55-10-103(a).

Here, a driver who passed the defendant on Highway 57 shortly after the accident saw the motorbike lodged underneath the defendant's car and smelled antifreeze and burning rubber, which was apparently caused by the motorbike as it dragged along the road. When the defendant reached his mother's house, which was one mile away from the scene of the collision, he called 911. When he returned to the scene forty-five minutes later, he told Trooper Perkins he "felt and heard a thug," but decided to continue traveling without stopping to investigate. Under the circumstances, however, he should have stopped immediately at the crime scene to evaluate whether

12

the boys required medical treatment.  <u>See</u> §§ 55-10-101(a), 55-10-103(a).  Moreover, by taking a forty-five minute hiatus from the scene of the collision, the defendant did not return "forthwith," as § 55-10-101(a) requires.  Thus, because the evidence revealed the defendant did not comply with the statutory requirements, the evidence was sufficient to prove the defendant left the scene of an accident, in violation of § 55-10-101.

Finding no merit to the defendant's arguments, we affirm the trial court's judgments.

_____
JOHN H. PEAY, Judge

CONCUR:


_____
DAVID G. HAYES, Judge


_____
L. T. LAFFERTY, Senior Judge