# IN THE TENNESSEE COURT OF CRIMINAL APPEALS

## AT JACKSON

## SEPTEMBER 1999 SESSION

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. W1998-00634-CCA-R3-DD |
| Appellee, | )  )  )  ) | SHELBY COUNTY  (No. 96-09279, 80 Below) |
| V. | )  )  ) | |
| VINCENT C. SIMS, | )  ) | HON. JOSEPH B. DAILEY, JUDGE |
| Appellant. | )  )  ) | (Especially Aggravated Burglary and  First-Degree Murder - Death Penalty) |

**FILED**

March 14, 2000

Cecil Crowson, Jr.
Appellate Court Clerk

FOR APPELLANT:

ON APPEAL:

**W. MARK WARD**
Assistant Public Defender

**TONY N. BRAYTON**
Assistant Public Defender

AT TRIAL:

**BETTY THOMAS**
Assistant Public Defender

**LARRY H. NANCE**
Assistant Public Defender
Criminal Justice Center, Suite 201
201 Poplar Avenue
Memphis, TN 38103

FOR APPELLEE:

**PAUL G. SUMMERS**
Attorney General & Reporter

**MICHAEL E. MOORE**
Solicitor General

**AMY L. TARKINGTON**
Senior Counsel
425 Fifth Avenue, North
Nashville, TN 37243

**WILLIAM L. GIBBONS**
District Attorney General

**JAMES M. LAMMEY**
Assistant District Attorney General

**LEE V. COFFEE**
Assistant District Attorney General
Criminal Justice Center, Suite 301
201 Poplar Avenue
Memphis, TN 38103

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL JUDGE

**O P I N I O N**

In this capital case, the defendant, Vincent C. Sims, was convicted by a jury of especially aggravated burglary and first-degree murder. The jury sentenced the defendant to death by electrocution. At the sentencing hearing, the jury found four aggravating circumstances: (1) the defendant was previously convicted of one or more felonies whose statutory elements involve the use of violence, (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (4) the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any burglary or theft. See Tenn. Code Ann. § 39-13-204(i)(2), (5), (6), and (7) (Supp. 1995). The jury found that there were no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances and sentenced the defendant to death by electrocution. At a separate hearing, the trial court sentenced the defendant to 20 years for his especially aggravated burglary conviction and ordered the sentence to run consecutively to the defendant's sentence of death.

The defendant makes the following arguments in this direct appeal: (1) that the evidence of premeditation is insufficient to support his first-degree murder conviction, (2) that the trial court erred by refusing to instruct the jury on the full law of self-defense and in charging the jury on the victim's right to self-defense, (3) that the trial court erred by failing to instruct the jury on voluntary manslaughter and criminally negligent homicide, (4) that the trial court erred by granting the state's special request for a jury instruction on felony-murder, (5) that the evidence is insufficient to support application of the prior violent felony aggravating circumstance, (6) that the trial court erred by allowing the state to impeach the defendant's mitigation witnesses with his prior convictions, (7) that the trial court erred by refusing to allow the defense to present hearsay evidence during the

sentencing phase, (8) that the state's closing argument during sentencing constituted prosecutorial misconduct, (9) that the evidence is insufficient to support a finding that the murder was especially heinous, atrocious, or cruel, (10) that the jury instruction on the heinous, atrocious, or cruel aggravating circumstance is unconstitutional, and (11) that the death penalty statutes are unconstitutional. We find that any error was harmless and affirm the judgment.

## BACKGROUND

The 42-year-old victim, Forrest "Chip" Smith, was killed during the burglary of his home on April 5, 1996. According to a co-worker, the victim left his place of employment that day at approximately 10:05 p.m.

That same night, the defendant called Brian Keith Mitchell, the defendant's cousin and co-defendant, from a phone booth around 8:40 or 8:50 p.m. The defendant told Mitchell that he had broken into a house and needed help carrying a television. Mitchell went to pick up his mother, and when he returned, the defendant was waiting for him. It was approximately 9:30 p.m. when Mitchell and the defendant drove to the victim's house in a 1994 Toyota Camry owned by the defendant's girlfriend. Mitchell did not see a weapon on the defendant, however, he did see something "poking" out of the defendant's clothes. Earlier that day, Mitchell had seen the defendant with a .22 caliber pistol with a brown handle and an eight- or nine-inch barrel.

It took approximately 30 minutes to drive to the victim's house. When they arrived at the house, there were no cars in the driveway, and no one was at home. The defendant told Mitchell to unscrew the sensor light on the carport. While Mitchell was doing this, the defendant went in the front door, which was halfway off its hinges, and let Mitchell in through the side door by the carport. The two men took the big screen television out to the trunk of the car. Once the television was in the trunk, the defendant and Mitchell went back into the house to find wire to tie the trunk down. The defendant told Mitchell to untangle the wire while he got a computer that was in the front bedroom. While they were

doing this, a light went on in the hallway. Mitchell ran out of the bedroom and saw the victim standing in the hallway with his empty hands in the air. Mitchell ran past the victim and out the door. The victim did not try to stop him. Mitchell tried to move the victim's vehicle, which was blocking the Toyota. The defendant came out of the house and tried to move the victim's vehicle as well. When they could not move the vehicle, the defendant ran back into the house to get the keys. Mitchell heard the defendant yell "Give me the keys, motherfucker, give me the keys." Then Mitchell heard eight or nine gun shots. The shots sounded the same and were in rapid succession. Mitchell slid the television out of the trunk when he heard the shots. When the defendant came out, he was holding a chrome .380 pistol and was holding his side, saying that he had been shot. The defendant threw Mitchell the keys and told him to move the victim's car to the end of the driveway. While Mitchell was moving the victim's car, the defendant moved the Toyota.

During the drive home, the defendant told Mitchell that he and the victim were "skrangling" over the gun when the defendant was shot in the side and the victim was shot in the head and neck. The defendant said that he had to turn the victim over to get the keys to his vehicle, and when asked why he killed the victim, the defendant said he had to because the victim saw his face. He appeared to be upset and excited after the murder. The defendant told Mitchell that he had lost his beeper but he was unsure where. He also told Mitchell not to tell anyone about the murder and that he was going out of town. At the time of the murder, the defendant was 24 years old and Mitchell was 17 years old.

The defendant's girlfriend, Tiffany J. Maxwell, testified that the defendant took her to work on April 5, 1996, and picked her up between 10:00 and 10:15 p.m. Maxwell's time sheets reflected that she worked until 11 p.m. that day, however, she testified that the defendant was always early. The defendant told her that someone had tried to rob him, and he had a deep scar on his side and blood on his shirt. She did not observe any other injuries. That night, they went home and went to bed. The next day, the defendant acted normal, and they took the car to be washed. At that time, Maxwell noticed that the frame on her license plate was broken. The defendant said someone had tried to steal the car.

They bought a new frame after having the car washed and threw the rest of the old one in a dumpster.

When Patricia Louise Henson, the victim's girlfriend, arrived home between 10:00 and 10:30 p.m. on April 5, she was unable to pull into the driveway because the victim's vehicle was parked across the sidewalk, blocking the driveway. After attempting to call and page the victim, Henson approached the house. She saw the big screen television under the carport and the side door to the house propped open. The porch light, which she had left on, was turned off, and the motion detector light was unscrewed. In the house, Henson found the victim lying in a pool of blood. The victim kept telling her to "call 911, help me, call 911." Henson immediately called 911 on her mobile telephone. When Henson asked the victim what had happened, he said "robbery."

The police arrived within a few minutes, and an ambulance followed. The first officer to arrive on the scene observed that the victim was bleeding from several places and appeared to be shot and in extreme pain. The victim told the officer twice that "they shot me in the head," however, the victim did not know who had shot him nor could he describe the suspects. Shortly thereafter, the victim became unconscious and was taken to the hospital, where he was eventually taken off life support between 2 and 3 a.m. on April 6, 1996.

Items missing from the house included the remote control for the television, an answering machine and telephone, and one of the victim's pistols. When the police moved the big screen television from the carport, a beeper was discovered. It was later determined that the beeper was owned by the defendant. Also found in the carport was a broken license plate frame.

Cartridge casings, bullet fragments, and bullet holes were found throughout the kitchen, living room, and hallway of the victim's house. Five fired .380 caliber cartridge cases were identified as having been fired from the same gun. A fired metal-jacketed

bullet was also consistent with a .380 caliber bullet. Three of the fragments, found in the north end of the hallway in front of one of the bedrooms, were of .22 caliber bullets. Another .22 caliber bullet fragment was removed from the north entry hall in a return air vent. The bullet removed from the victim was also a .22 caliber bullet. From all the bullet fragments examined, there were positively four separate bullets, and potentially five, which were .22 caliber.

On October 29, 1996, the defendant gave Mitchell a statement regarding the incident and told him to give it to his lawyer. Mitchell's attorney, Bill Anderson, Jr., confirmed that on October 29, 1996, his client gave him a written statement outlining a version of the offense. This document was examined by a forensic document examiner, who concluded that the document was written by the defendant.

In this written statement, the defendant indicated that the victim entered the residence unnoticed and retrieved a .380 caliber pistol from the back of the house. The victim confronted "the two burglars" with the .380 caliber pistol, and Mitchell ran out of the house. As the defendant tried to run, the victim began shooting at him. When the defendant tried to stop the victim from killing him, a "scuffle and struggle ensued." According to the statement, the result was the victim being shot once in the head with his .380 caliber pistol. The defendant then fled the house with the victim's .380 caliber pistol and keys.

The autopsy on the victim was performed by Dr. Wendy Guther. The victim's arms were covered with bruises. The left arm was almost completely bruised on the back, and the right arm was bruised in a couple of places on the front. There were bruises on the bottom of the spine, on the right side of the buttocks, and near two wounds on the back of the neck. Some of the bruises were white with purple bruises on either side and were in the shape of a narrow object, such as a rod. From the shape of these bruises, Dr. Guther concluded that some of the beating was done with an object that was a quarter inch in width and at least one and a quarter inches long.

There were four blows to the left side of the head and there was blood on the brain. A bullet went in behind the victim's right ear, going through the frontal lobes of the brain, and stopping inside the skull above the right eye. A portion of the bullet exited the body in front of the ear. The bullet went from the back towards the front of the body, somewhat right to left, and slightly upwards.

There were at least six blows to the head that resulted in a mark, and the victim had bitten his tongue several times. In Dr. Guther's opinion, the victim was struck a minimum of ten times and died of a combination of injuries. The most serious injury was from the bullet that went through the frontal lobe of the brain, causing the brain to swell. This wound would have produced death within several hours. The heavy blows to the head produced blood on the brain and also contributed to the victim's death. Finally, the many impacts to the arms, upper back, and sides represented bleeding into the skin, and added together, also contributed to the victim's death, although these injuries were less significant. According to the death certificate, the victim was declared dead at 3 a.m.

Dr. Steven A. Symes, a forensic anthropologist, testified that there were two fractures to the victim's skull. The first trauma was above the ear on the right side to the temporal bone, and the second trauma was to the parietal bone on the right side, slightly back and above the first.

The trauma right above the ear was a guttering puncture wound caused by a projectile impacting with the bone. Dr. Symes identified this wound as a gunshot wound. The projectile moved back to front and slightly right to left. Based on the radiating fractures from each trauma, Dr. Symes was able to conclude that the trauma caused by the gunshot wound occurred first, but he could not determine the amount of time between each. Although the non-gunshot wound did not punch a hole through the skull, a punched-out plug of bone was pushed through on the inside of the skull.

Based on this evidence, the jury found the defendant guilty of especially aggravated burglary and first-degree premeditated murder beyond a reasonable doubt.

At the sentencing phase, the state presented proof of the defendant's two prior convictions of aggravated assault, which were entered on April 2, 1991.

The defendant presented the testimony of his mother, Jenny B. Sims. She testified that the defendant was born on November 5, 1972. He started having problems with other friends in the eighth or ninth grade. Because the defendant was small when he entered junior high, the bigger students would bother him. His parents never had trouble with the defendant, who was always respectful to them and to the family. If there was a problem, they could talk to the defendant, and he would listen. According to Mrs. Sims, on October 26, 1990, the defendant went to a football game with some friends, and two boys tried to jump him. They put up their guns, and the defendant's friend, who was in the car with the defendant, gave the defendant a gun. The gun went off, resulting in the aggravated assault charges. During cross-examination, the prosecution questioned Mrs. Sims regarding the facts resulting in the defendant's two aggravated assault convictions.

Generally, the defendant always worked. At some point, he was expelled from school because of fighting and then went to night school. The family is very close, and growing up, the defendant was close to his brother, who is three years older. The defendant was having problems and dropped out of school around the time that his brother left for college.

The defendant has two children, Quinton and Jasmine, and was married to Doris Marie Sims. He enjoyed playing basketball, listening to music, and spending time with his family. After his release from prison, the defendant was quiet and mostly stayed to himself. Mrs. Sims testified that she loved her son and would support him regardless of the verdict. She also testified that she was sorry for the victim's family.

The defendant's father, Jimmy Sims, Jr., testified that up through the defendant's 25 years of life, he was a "good child." The defendant was never disrespectful to his parents and did everything they asked him to do. He was an honor student and a school favorite. When the defendant was 11 or 12, he won second place at a dance

-7-

contest. The defendant played by himself as a child when he was not with his brother. When his brother went to college in 1988, the defendant began having problems. Even when he had problems, the defendant was always respectful to his parents. In junior high, the defendant was picked on because of his size, and the defendant's father encouraged him to stand up for himself.

After he was released from incarceration, the defendant lived with his parents. Once the defendant was shot while trying to stop a fight. The defendant was not working at the time of the murder.

Mr. Sims was aware that the defendant had been convicted of theft of property under $500 on November 27, 1990, two counts of aggravated assault on April 2, 1991, and aggravated burglary on January 22, 1993. Mr. Sims told the defendant the first time to learn from his mistake. After the third conviction, he told the defendant that he was going to mess up his life if he continued this behavior and that Mr. Sims would be unable to help him. Mr. Sims testified that he loved his son and would support him, but that he did not condone his behavior.

The defendant's aunt, Naomi Gardner, testified that as a child, the defendant was interested in dancing. He was very quiet and close to his older brother. Ms. Gardner would see the defendant at family gatherings. While the defendant was in jail, Ms. Gardner talked to him two or three times a month. She loves the defendant and will be there for him. During cross-examination, Ms. Gardner testified that she believed the defendant was a good person and was not dangerous despite her knowledge of his prior convictions.

Trezevant Warren Gardner, the defendant's older brother, testified that the defendant was shy growing up and looked up to his older brother. Approximately six years earlier, Mr. Gardner and the defendant were at a park when the defendant took a gunshot for his brother during an altercation. When the defendant was younger, Mr. Gardner had to extricate him from fights and arguments. The defendant was beaten up as a child and was stabbed once. Mr. Gardner has been to see the defendant in jail many times and is

-8-

supportive of him. Despite their similar upbringing, Mr. Gardner has not had any of the defendant's problems. Mr. Gardner was aware of the defendant's prior convictions.

Mary Gardner, the defendant's aunt, described the defendant as a beautiful, interesting, intelligent, and creative child. Ms. Gardner, who was employed at the Shelby County Correctional Center from 1978 to 1996, observed the defendant when he was a prisoner there on two occasions. The defendant was a role model prisoner, doing what he was told, getting involved through classes, and working hard. The defendant did not have any write-ups while he was there. Ms. Gardner loves and supports the defendant.

Based on the proof, the jury found four aggravating circumstances: (1) the defendant was previously convicted of one or more felonies whose statutory elements involve the use of violence, (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (4) the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any burglary or theft. See Tenn. Code Ann. § 39-13-204(i)(2), (5), (6), and (7) (Supp. 1995). The jury determined that these aggravating circumstances outweighed any mitigating circumstances and sentenced the defendant to death by electrocution.

**SUFFICIENCY OF EVIDENCE OF PREMEDITATION**

The defendant contends that the evidence presented at trial was insufficient to justify a rational trier of fact in finding that at the time of the murder, he was acting free from passion and excitement so as to premeditate the killing. We find that the proof of premeditation is sufficient.

A jury verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state's theory. State v. Williams, 657 S.W.2d 405, 410

(Tenn. 1983). On appeal, the state is entitled to the strongest legitimate view of the evidence and to all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Moreover, a guilty verdict removes the presumption of innocence which the appellant enjoyed at trial and raises a presumption of guilt on appeal. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The appellant has the burden of overcoming this presumption of guilt. Id.

In reviewing the sufficiency of the evidence, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); T.R.A.P. 13(e).

At the time of the defendant's offense, first-degree murder was defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1995). Under the statute, premeditation requires "the exercise of reflection and judgment," Tenn. Code Ann. § 39-13-202(d) (Supp. 1995), and "a previously formed design or intent to kill." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992) (citing McGill v. State, 4 Tenn. Crim. App. 710, 720, 475 S.W.2d 223, 227 (1971)). The purpose to kill does not necessarily have to pre-exist in the mind of the accused for any definite period of time. Instead, it is the mental state of the accused at the time the accused allegedly decided to kill that must be considered in order to determine whether the accused was sufficiently free from excitement and passion to be capable of premeditation. Tenn. Code Ann. § 39-13-202(d) (Supp. 1995). At the same time, if a defendant becomes impassioned later, but "the intent to kill was formed as a result of premeditation ... prior to the crime, it is immaterial that the act was carried out in a state of passion." State v. Roy Keough, No.02C01-9708-CR-00317, slip op. at 13 (Tenn. Crim. App., at Jackson, Jan. 13, 1999), transferred, No. 02S01-9901-CR-00009 (Tenn. Jan. 27, 1999)(Oral argument on Nov. 17, 1999); State v. Edwin Jesperson, No. 03C01-9206-CR-00212, slip op. at 7 (Tenn. Crim. App., at Knoxville, Aug. 11, 1993) (citing Leonard v. State, 292 S.W.2d 849, 852 (Tenn. 1927)), perm. to app. denied (Tenn. Dec. 6, 1993).

The element of premeditation is a question of fact to be resolved by the jury. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993); State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). "As is usually the case, a determination of a culpable mental state, such as premeditation, must be inferentially made from the circumstances surrounding the killing." State v. Burlison, 868 S.W.2d 713, 717 (Tenn. Crim. App. 1993); See Gentry, 881 S.W.2d at 3.

While there is no strict standard governing what constitutes proof of premeditation, Tennessee Courts have relied on the following circumstances in determining whether an inference of premeditation is supported: the use of a deadly weapon upon an unarmed victim; the fact that the killing was particularly cruel; evidence of procurement of a weapon; the victim was retreating or attempting to escape when shot; the making of preparations before the killing for the purpose of concealing the crime; calmness immediately after the killing; and declarations by the defendant of his intent to kill. See, e.g., State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)(citing State v. Brown, 836 S.W.2d 530, 541-42 (Tenn. 1992); State v. West, 844 S.W.2d 144, 148; State v. Martin, 702 S.W.2d 560, 562 (Tenn. 1985) (citations omitted), overruled on other grounds, Brown, 836 S.W.2d at 543.

Other relevant factors from which a jury may infer premeditation include planning activities by the defendant prior to the killing, facts about the defendant's prior relationship with the victim from which motive may be inferred, and the nature of the killing. Gentry, 881 S.W.2d at 4-5 (citation omitted). "The fact that repeated blows (or shots) were inflicted on the victim is not sufficient, by itself, to establish first-degree murder." Brown, 836 S.W.2d at 542 (emphasis added); see also State v. Darnell, 905 S.W.2d 953, 962 (Tenn. Crim. App. 1995).

The proof in this case was sufficient to support the jury's verdict. From the proof, the jury could have concluded that the defendant had in his possession a .22 caliber long-barreled pistol, that he went armed when burglarizing the victim's home, and that he shot the victim with this weapon. Mitchell, the co-defendant, testified that he had seen the

-11-

defendant with a .22 caliber long-barreled pistol earlier on the day of the murder.  He also saw an object "poking" from the defendant's shirt when the defendant drove him to the victim's home.  Moreover, the victim was shot in the back of the head with a .22 caliber bullet, and bullet fragments from a total of four, and possibly five, separate .22 caliber bullets were recovered.  The victim was also repeatedly beaten with a long cylinder-type object, such as a long-barreled gun, and one of the blows cracked the victim's skull, producing blood on his brain.

There was also proof of the defendant's motive.  See State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).  Following the murder, the defendant told Mitchell that he had to kill the victim because the victim had seen his face.  After the defendant and Mitchell were caught in the house by the victim, they ran out and tried to drive away.  When neither could move the victim's vehicle, which was blocking their own, the defendant went back in the house, demanding the victim's keys. Mitchell immediately heard shots being fired.  The victim was shot in the back of the head with a .22 caliber bullet and was repeatedly beaten.  The medical testimony showed that the blow cracking the victim's skull was done after the victim had been shot. The proof also showed that the victim sustained a minimum of ten hard blows.  The defendant then had to turn the victim over so he could recover the keys.  Afterwards, the defendant picked up his girlfriend and went home to go to sleep, showing a calmness after the murder.

Based on our review of the proof, we find that the evidence is sufficient to support the jury's finding of premeditation.

**JURY INSTRUCTIONS ON SELF-DEFENSE**

Next, the defendant argues that the trial court's instruction on self-defense improperly raised the inference that the victim had an absolute right to use force regardless of whether the defendant was abandoning the encounter.  Moreover, the defendant contends that the trial court erred by refusing to give a full jury charge on the law of self-defense.  Specifically, he submits that the 1989 Criminal Code omitted any limitation on the law of self-defense as it may apply to a felony murder other than the "initial aggressor"

-12-

rule.  The defendant submits that the instructions given violated his right to have the jury fully instructed and to have a meaningful opportunity to present a complete defense.

From the record, it appears that the trial court gave the following instruction to the jury on self-defense:

> Any person using force intended or likely to cause death or serious bodily injury within their own residence is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

In ruling on what portions of the self-defense law to charge the jury, the trial court made the following findings:

> Well, I think the facts would certainly bear that out [the self-defense of a residence], the facts that are before us today, both the facts from Mr. – well, from several witnesses.  From Ms. Henson, from Mr. Mitchell, and from this letter that the Defense relies on, this man's home – the facts are uncontroverted that this man's home had been unlawfully and forcibly entered by Mr. Vincent Sims.  And the facts are also uncontroverted that he knew or had reason to believe that an unlawful and forcible entry occurred as he pulled up into his driveway and parked right in front of a strange car, and that strange car having his big screen TV in the trunk at that point.

> I mean, you know, I'm always cognizant of the need to be careful not to comment on the evidence because I don't want to re-try this case any more than anybody else does.  But this is what the law states.  This is a clear and unambiguous statement of the law, and the jury is entitled to know what a homeowner is entitled to do under these circumstances.

> And the law further does not allow an individual to avail himself of self-defense under any scenario that we've heard in this trial.  So I believe that paragraph (B) under 39-11-611 would be appropriate but that a charging of the entire self-defense would not be.  Unless there's some facts to warrant it or justify it, it's just not appropriate to be charging something to lend credence to something that doesn't even exist in the facts by any interpretation.

> And I've yet to hear one, even from [defense counsel], even his reference to this letter that convinces me that under any scenario Mr. Sims had a right to avail himself of the defense of self-defense.

> Scenario number one, the letter, in that, by Mr. Sims' own statement, he's in the middle of a burglary, trying to get out of the house when all this occurs.

> Scenario number two, by Mr. Mitchell's statement, Mr. Sims had come out of the house and realizing he couldn't get his car out, goes back in and the only words that are heard are words from Mr. Sims to the effect of, Give me your keys, and then shots.

So that's my ruling. I'm not going to charge self-defense. I am going to charge this one paragraph.

Initially, the Court agrees with the defendant that the trial court erred when it instructed the jury about the right of a person to use deadly force against an intruder in his or her residence. In State v. Belser, 945 S.W.2d 776 (Tenn. Crim. App. 1996), the defendant shot and killed the victim during an argument on the victim's front porch. The state requested and the trial court instructed the jury based on Tennessee Code Annotated section 39-11-611(b). This Court noted that under Tennessee Code Annotated section 39-11-601, self-defense may only be utilized as a defense of a prosecution. Id. at 782. Moreover, the Court held that "it is not, however, any justification for a victim's conduct." Id. Thus, the instruction was not warranted by the facts and impermissibly shifted the burden of proof to the defendant. Id. This Court went on to determine that it was harmless error because the trial court gave the defendant's self-defense instruction to the jury. At the conclusion of the self-defense charge, the trial court also correctly pointed out the burden on the state to prove beyond a reasonable doubt that the defendant did not act in self-defense. This served to mitigate any adverse consequences from the charge. Id. at 783.

Under Belser, it was error for the trial court to instruct the jury in this case that it could presume the victim acted in self-defense because the instruction was inapplicable to the facts presented at trial. However unlike Belser, as discussed below, the defendant in this case was not entitled to an instruction on self-defense. Thus, the Court concludes that the error was harmless.

Under the previous Tennessee felony murder statute, self-defense could not justify a killing when the defendant was engaged in a felony. Smith v. State, 354 S.W.2d 450, 451-52 (Tenn. 1961). However, in 1989, the Legislature revised the Criminal Code and established statutory defenses that are applicable to all criminal offenses unless otherwise provided by the Code. It is not for this Court to choose or reject any particular defense for a particular offense, State v. Culp, 900 S.W.2d 707, 710 (Tenn. Crim. App.

-14-

1994), nor can this Court add or subtract from the elements of each statutory defense. Id. See Tenn. Code Ann. § 39-11-601, et seq. Accordingly, we must look to the statute to determine whether the defendant was entitled to raise self-defense.

When self-defense became a statutory defense, the Legislature did not specifically include the felony-murder exception. Instead, the statute codified the "initial aggressor" exception. Self-defense is defined in Tennessee Code Annotated section 39-11-611, which provides in part:

> (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

> (b) Any person using force intended or likely to cause death or serious bodily injury within their own residence is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

> * * * *

> (d) The threat or use of force against another is not justified if the person provoked the other individual's use or attempted use of unlawful force, unless:

>> (1) The person abandons the encounter or clearly communicates to the other the intent to do so; and

>> (2) The other nevertheless continues or attempts to use unlawful force against the person.

Teen. Code Ann. § 39-11-611 (1991 Repl.).

The Sentencing Commission Comments are enlightening on the intent of the codification of this common law defense:

> Subsections (c), (d) and (e) are restrictions to the defense. Subsections (c) and (d) continue the traditional rule that the defendant claiming justification should be free from fault in bringing on the necessity of using force...Subsection (d) also restricts the defense by codifying the traditional concept of the initial aggressor. In order to use the defense, the initial aggressor must withdraw or communicate an intent to withdraw and the force must continue despite this communication. See Irvine v. State, 104 Tenn.

-15-

132, 56 S.W. 845 (1900); Gann v. State, 214 Tenn. 711, 383 S.W.2d 32 (1964).

In Gann v. State, 214 Tenn. 711, 383 S.W.2d 32, which is cited in the Sentencing Commission Comments, the Supreme Court further explained the initial aggressor exception:

> The law of Tennessee is that an aggressor, who produces fear or apprehension of death or great bodily harm in the mind of his adversary, can not lawfully defend his life against the deadly defensive act of his adversary by taking the latter's life, until he has restored his right of self-defense, lost by his initial fault, by abandoning and withdrawing from the contest and giving notice of the fact to the adversary. The aggressor's act is unlawful and felonious, and his adversary's act lawful and necessary, and the former, as the guilty party, must bear all unavoidable consequences flowing from his wrongful act.

Id. at 719-20, 383 S.W.2d at 36 (citations omitted).

Accordingly, based on the language of the statute and the cases cited in the Sentencing Commission Comments, a defendant is not automatically precluded from raising self-defense when force is used during the commission of a felony. Self-defense would be available if the proof "fairly raised" the issue of whether the defendant withdrew or communicated an intent to withdraw and the force continued despite this communication. In order to determine whether the proof "fairly raises" the issue of self-defense, the trial court must assess the defendant's position without ascertaining its truthfulness or the weight to which it might be entitled. State v. Ivy, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). In effect, the trial court must "consider the evidence in the light most favorable to the defendant, including drawing all reasonable inferences flowing from that evidence." State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). The jury, not the trial court, is to resolve the factual dispute and ascertain the applicable law. Ivy, 868 S.W.2d at 728. In a later case, this Court explained that the "test for whether a special instruction must be given is whether 'there is any evidence which reasonable minds could accept as to any such [defense] . . . .'" State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (quoting Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975)).

In support of his theory of self-defense, the defendant relies upon the statement which he gave to Mitchell. The statement reads in part:

> The homeowner pulled his vehicle in [behind] suspects vehicle blocking them in Homeowner then entered his residence went to a rear bedroom without being noticed by the two burglars and retrieved a 380 pistol from a dresser draw[er] and then confronted intruders with the 380 pistol Brian ran out of residence and I Vincent Sims also tried to run out of the residence that's when homeowner began shooting several shots at Vincent Sims grazing him in the right side and left hip. That's when Vincent tried to stop the homeowner from killing him and a scuffle and struggle ensued between Vincent Sims and homeowner the end results were that the home owner Mr. Forrest Smith was shot once in the head with his .380 pistol. Vincent Sims then picked up the homeowner['s] 380 pistol and keys and fled the scene with Brian K. Mitchell in a 1994 maroon Toyota Camry.

While the credibility of this statement is clearly suspect, the standard of review does not allow the trial court to ascertain the truthfulness or weight of the proof. Nevertheless, the Court concludes that the defendant was not entitled to an instruction on self-defense because the defense was not "fairly raised" by the proof. Under the governing statute, an initial aggressor can only claim self-defense if the aggressor had abandoned the encounter or clearly communicated to the other the intent to do so and the other nevertheless continued or attempted to use unlawful force against the initial aggressor. According to the defendant's statement, he was still in the process of burglarizing Smith's residence when Smith confronted him with a firearm. The defendant then attempted to leave the residence, but he remained close enough to Smith that he was able to engage in a physical struggle with Smith after Smith fired shots at him. Rather than continuing his attempt to leave after he was fired upon, the defendant became engaged in the physical altercation with Smith that resulted in Smith's death. Thus, even if accepted as true, the defendant's statement does not contain proof which tends to show that he "abandon[ed] the encounter or clearly communicate[d] to the other the intent to do so." Nor is there any other evidence in the record that, if accepted as true, could be accepted as showing that the defendant either abandoned his encounter with Smith or clearly communicated his intent to do so. When a defense is not fairly raised by the proof, it is not error for a trial court to refuse to instruct the jury on the defense. Davenport, 973 S.W.2d at 288.

In short, we agree with the defendant that the trial court erred when it instructed the jury on Smith's presumed right to use force against the defendant. However, the defendant was not entitled to an instruction on self-defense and the concern about confusing the jury in regard to the burden of proof that this Court was concerned with in Belser is not present in this case. As such, we conclude that the trial court's error was harmless error beyond a reasonable doubt. T.R.A.P. 36(b); Tenn. R. Crim. P. 52(a). This issue is without merit.

## JURY INSTRUCTIONS ON LESSER-INCLUDED OFFENSES

The defendant contends that the trial court erred by failing to instruct the jury on voluntary manslaughter and criminally negligent homicide as lesser-included or lesser grade offenses. Moreover, the defendant submits that failure to so instruct was not harmless error.

Under State v. Trusty, 919 S.W.2d 305 (Tenn. 1996), a defendant was entitled to jury instructions on lesser-included offenses and lesser grades or classes of the offense charged if the evidence would support a conviction for the offense. Id. at 311. Recently, our Supreme Court overruled Trusty to the extent that it recognized "lesser grade" offenses as distinct from lesser-included offenses and permitted convictions of "lesser grade" offenses that were not lesser-included offenses embraced by the indictment. State v. Dominy, 6 S.W.3d 472, 473 (Tenn. 1999). See also, State v. Burns, 6 S.W.3d 453 (Tenn. 1999). Under the new case law, a defendant is only entitled to instructions on lesser-included offenses. The definition of lesser-included offense is set forth in State v. Burns:

> An offense is a lesser-included offense if:
>
> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
>
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>
> > (1) a different mental state indicating a lesser kind of culpability; and/or
> >
> > (2) a less serious harm or risk of harm to the same person, property or public interest; or

-18-

(c) it consists of

> (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

> (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included in part (a) or (b); or

> (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Burns, 6 S.W.3d at 466–67.

Voluntary manslaughter is defined as the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner. Tenn. Code Ann. § 39-13-211(a) (1991 Repl.). Under the new test, voluntary manslaughter would be a lesser-included offense of first-degree murder. Specifically, its statutory elements fail to meet the definition of first-degree murder in part only in the respect that it contains a statutory element establishing a different mental state indicating a lesser kind of culpability. Burns, 6 S.W.3d at 466–67. See also, Dominy, 6 S.W.3d at 477, n. 9.

Criminally negligent homicide, defined as criminally negligent conduct which results in death, Tennessee Code Annotated section 39-13-212 (1991 Repl.), is also a lesser-included offense. See Burns, 6 S.W.3d at 466–67. Compare, State v. Lynn, 924 S.W.2d 892, 899 (Tenn. 1996) (criminally negligent homicide is lesser-included offense of second-degree murder).

Having determined that voluntary manslaughter and criminally negligent homicide are both lesser-included offenses, the next inquiry is whether the evidence justified a jury instruction on such lesser offenses. Burns, 6 S.W.3d at 467. The Supreme Court has set forth a two-part test. First, the trial court must determine whether "any evidence exists that reasonable minds could accept as to the lesser-included offense." In making this determination, the trial court must "view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on

the credibility of such evidence." Id. at 469. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense. Id.

In the present case, there is no evidence in the record supporting the existence of these lesser-included offenses, and the trial court did not err by refusing to instruct the jury on either. Moreover, even if it was error not to instruct the jury on voluntary manslaughter and negligent homicide, such error was harmless. Our Supreme Court has stated that error associated with the trial court's failure to instruct a lesser-included offense is harmless when the jury finds the defendant guilty of the greater offense and declines to convict the defendant of other lesser-included offenses that were instructed by the trial court and that are greater offenses than the one requested. State v. Williams, 977 S.W.2d 101, 106-108 (Tenn. 1998). See also, State v. Atkins, 681 S.W.2d 571, 577 (Tenn. Crim. App.1984). In the present case, the sequential instructions to the jury included a charge on second-degree murder, and the jury concluded that the defendant was guilty of premeditated first-degree murder beyond a reasonable doubt. Accordingly, under Williams, any error in declining to give instructions on voluntary manslaughter and criminally negligent homicide would be harmless beyond a reasonable doubt. This issue is without merit.

### JURY INSTRUCTION ON FELONY-MURDER

The defendant contends that the trial court erred by granting the state's special request that the jury be instructed that a felony participant is responsible for any death that ensues as a result of the felony. Specifically, he asserts that the trial court took no precautions to ensure the limited applicability of the instruction to the charge of felony-murder, and thus, the jury could have believed that the state did not have to prove mens rea for the charge of premeditated murder. We disagree.

It appears that the trial court instructed the jury first on premeditated murder. The jury was then instructed on murder during the perpetration of a burglary, on murder

during the perpetration of a theft, and theft of property. At the end of these instructions, the trial court gave the following charge:

> When one enters into a scheme with others to commit a burglary or a theft and a killing ensues, all participants in the burglary or theft may be held responsible for the death, regardless of who actually committed the murder and whether the killing was specifically contemplated by the others.

> As long as the defendant intended to commit the burglary or theft and a killing resulted during the attempt to perpetrate the burglary or theft, each defendant is responsible for the murder, regardless of whether he intended for the victim to die or participated in the act of murder.

Thereafter, the trial court instructed the jury on second-degree murder. The trial court also gave a criminal responsibility instruction later in the charge.

The defendant's argument that the trial court failed to limit the instruction to the felony-murder charge and thus, eliminated the state's responsibility to prove mens rea on the premeditated murder charge is without merit. First, the trial court specifically instructed the jury on the elements of premeditated murder, and the jury is presumed to have followed the trial court's instruction. State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). Moreover, a challenge to a single jury instruction must be judged in context of the entire jury charge. See Cupp v. Naughten, 414 U.S. 141, 146-147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); State v. Bolin, 678 S.W.2d 40, 43 (Tenn. 1984). In the present case, the contested instruction, albeit unnecessary, was given in conjunction with the felony-murder instructions, and in the context of the entire jury charge, we find that the special instruction was not error.

## "PRIOR VIOLENT FELONY" AGGRAVATING CIRCUMSTANCE

The defendant contends that the aggravating circumstance, that he committed prior felonies whose statutory elements involve the use of violence, was not supported by the record. Specifically, the defendant contends that the statutory elements of aggravated assault, the prior violent felonies relied upon by the state, do not necessarily involve the use of violence because aggravated assault can be committed merely by displaying a deadly weapon in a way that causes the victim to reasonably fear imminent bodily injury. Accordingly, the defendant asserts that the trial court erred by going beyond

the statutory elements of aggravated assault and considering the actual facts of his prior offenses, that the state erred in placing the aggravated assaults into evidence and/or by placing the underlying facts of the offenses into evidence, and the trial court erred in charging the jury that the aggravated assaults involved the use of violence to the person.

While we find that the trial court did not err by allowing the jury to consider this aggravating circumstance, it appears that the defendant raises an issue of first impression. The Courts of this state have not specifically addressed this issue. However, the Tennessee Supreme Court has impliedly recognized that an offense may be an offense whose statutory elements involve the use of violence to the person even though bodily injury to the victim is not a required element of the offense.

In State v. Vann, 976 S.W.2d 93 (Tenn. 1998)(appendix), the defendant asserted that because aggravated rape could be proven by a showing that there was unlawful sexual penetration of a victim less than 13 years old, aggravated rape did not necessarily involve violence to the person and thus, a conviction for aggravated rape did not support the application of the aggravating circumstance that the defendant was previously convicted of a felony whose statutory elements involve the use of violence to the person. In regard to this argument, the Supreme Court adopted this Court's ruling that rape is a serious offense which is injurious to both the body and the mind of the victim. Id. at 116 (appendix)(citing State v. Hoyt, 928 S.W.2d 935, 948 (Tenn. Crim. App. 1995)). This Court also noted that the Supreme Court had impliedly acknowledged the use of aggravated rape as an aggravating circumstance. Id. (citing State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994)).

In State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998), our Supreme Court upheld the use of two attempted second-degree murder convictions to establish the aggravating circumstance that the defendant had previously been convicted of a felony whose statutory elements involve the use of violence to the person. Id. at 782. The Court held that while the statutory elements of criminal attempt do not involve the use of violence to the person,

-22-

attempted second degree murder still qualified as a felony whose statutory elements involve the use of violence to the person. Id.

In State v. Hodges, 944 S.W.2d 346 (Tenn. 1997), our Supreme Court held that the evidence was sufficient to establish the aggravating circumstance that the defendant had previously been convicted of felonies whose statutory elements involve the use of violence to the person because the defendant had previously been convicted of armed robbery, robbery, and attempted kidnapping. Id. at 357.

Vann, Cribbs, and Hodges all upheld the application of the aggravating circumstance that the defendant had previously been convicted of felonies whose statutory elements involve the use of violence to the person even though the offenses relied on could be committed without causing bodily injury to a victim. Thus, we conclude that aggravated assault is also a felony whose statutory elements involve the use of violence to the person, regardless of the elements that were actually relied on to support the conviction. Accordingly, we hold that the proof supported a finding that the defendant had previously been convicted of two prior felonies that involved the use of violence to the person and that the trial court properly charged the jury on this aggravating circumstance.

**IMPEACHMENT OF MITIGATION WITNESSES**

Next, the defendant contends that the trial court erred in allowing the state to cross-examine his witnesses during the sentencing hearing about his prior convictions for theft, aggravated burglary, and aggravated assault. First, he argues that the testimony of the defendant's father did not open the door with regard to general character evidence. Second, the defendant submits that even if the evidence could be deemed character evidence, it only pertained to the defendant's character as a child and the state's impeachment of the mitigation witnesses with questions regarding the defendant's adult convictions was irrelevant. Third, the defendant argues that the trial court failed to consider whether the probative value of the evidence outweighed the prejudicial effect. Fourth, the defendant contends that any error was not harmless because the state cross-examined

three additional witnesses about the prior convictions, the state made extensive references to the prior convictions during closing arguments, and the trial court did not instruct the jury that it could consider the prior convictions only as impeachment evidence. Essentially, the defendant contends that the state's cross-examination with the prior convictions was improper because it failed to satisfy the requirements of Rule 405 of the Tennessee Rules of Evidence.

At the sentencing hearing, the defendant's mother testified that the defendant had had "several employments" and he generally worked. The defendant's mother also testified that the defendant had been married for four years, was the father of two children, and he liked to spend his time "just being around family."

Defense counsel subsequently asked the defendant's father during direct examination "[w]hat kind of person was [the defendant] up through the 25 years of his life that you've known him?" The defendant's father responded "Vincent was a good child. Good one." When asked what he meant by good, the defendant's father testified that the defendant "wouldn't disrespect me or his mother." The defendant's father also testified that the defendant did not get into a lot of fights when he was growing up and he was not aggressive. The defendant's father also stated that the defendant had previously interceded in an altercation on behalf of his brother and had been shot while doing so. Further, the defendant's father testified that when the defendant was released from confinement for his previous convictions, he was always working or spending time with his family.

Before cross-examining the defendant's father, a bench conference was held, during which the state requested permission to ask the witness if he was aware of the defendant's prior convictions in order to refute his testimony that the defendant was a "good person." In ruling that the defense had "opened the door," the trial court stated:

> [W]hile it's true that the questions weren't phrased in the more traditional character slash reputation proof form, that was in essence what was being elicited from this witness and the previous witness, but certainly this witness, in asking him what kind of person the defendant was, if he was a good

person, and if he basically worked, and that sort of thing. I think it opened the door sufficiently and I'll allow these two prior convictions to be asked.

The state then proceeded to question the defendant's father about the defendant's conviction of theft of property under $500 on November 27, 1990, his conviction of two counts of aggravated assault on April 2, 1991, and his conviction of aggravated burglary on January 22, 1993.

One of defendant's aunts then testified that she had known the defendant all his life, and he was very close to his family. The defendant's brother testified that the defendant was not an aggressive person when he was growing up. The defendant's brother also testified that the defendant had intervened in a fight on his behalf and had been shot as a result. Another of defendant's aunts testified that she had been employed at the institution where the defendant had been incarcerated, and the defendant was a model prisoner who never got into trouble. The state cross-examined each of these witnesses regarding the defendant's prior convictions. The elicited testimony was then emphasized during the prosecution's closing arguments.

First, we note that the admissibility of evidence and the propriety and form of cross-examination are entrusted to the sound discretion of the trial court. See, e.g., State v. Hutchison, 898 S.W.2d 161, 172 (Tenn. 1994). Absent an abuse of that discretion, such rulings will not be reversed on appeal. State v. Caughron, 855 S.W.2d 526, 541 (Tenn. 1993).

The defendant contends that the defense witnesses should not have been cross-examined about their knowledge of his prior convictions because the requirements of Rule 405 of the Tennessee Rules of Evidence were not satisfied. However, we note that Tennessee Code Annotated section 39-13-204(c) provides:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the

defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee.

Tenn. Code Ann. § 39-13-204(c) (1997) (emphasis added). Under the express terms of this statute, evidence of the defendant's prior convictions was admissible in the capital sentencing hearing as long as it was relevant to the rebutting of a mitigating circumstance, subject to constitutional limitations. In addition, under the express terms of the statute, the admissibility of such evidence was not subject to the Tennessee Rules of Evidence and thus, whether the admission of the prior convictions was proper under Rule 405 would simply not be relevant.

We note that the Tennessee Supreme Court has arguably made conflicting statements about the interplay between section 39-13-204(c) and the rules of evidence. For instance, our Supreme Court held in State v. Odom, 928 S.W.2d 18 (Tenn. 1996), that section 39-13-204(c) "expressly exempts evidence in capital sentencing proceedings from the usual evidentiary rules." Id. at 28. Similarly, in State v. Van Tran, 6 S.W.3d 257 (Tenn. 1999), the Supreme Court cited section 39-13-204(c) for the proposition that "the rules of evidence do not limit the admissibility of evidence at capital sentencing hearings." Id. at 271. Likewise, when the Supreme Court addressed the introduction of photographs during a capital sentencing hearing in State v. Hall, 8 S.W.3d 593 (Tenn. 1999), the Court stated:

> The admissibility of evidence at a capital sentencing hearing is controlled by Tenn. Code Ann. § 39-13-204(c) (1991), which allows the admission of any evidence "the court deems relevant to the punishment . . . regardless of the rules of evidence," subject to a defendant's opportunity to rebut any hearsay statements and to constitutional limitations.

Id. at 602. In addition, the Supreme Court clearly implied that this Court had erred when it analyzed the issue under Rules 401 and 403 of the Tennessee Rules of Evidence. Id. at 602 n. 5. On the other hand, in State v. Burns, 979 S.W.2d 276 (Tenn. 1998), the Supreme Court cited Rule 403 for the proposition that in regard to the admissibility of evidence under section 39-13-204(c), the trial court should "exclude any evidence where its probative value is substantially outweighed by its unfair prejudice." Id. at 282. Similarly, in State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998), the Supreme Court held that under Rule 403, evidence admissible under section 39-13-204(c) should be excluded by the trial court

if its probative value is substantially outweighed by its prejudicial effect.  Id. at 891. Further, in State v. Nichols, 877 S.W.2d 722 (Tenn. 1994), the Supreme Court held that the admissibility of prior convictions in a capital sentencing hearing is governed by Rule 404(b); however, the Court made no mention of section 39-13-204(c).  Id. at 732.

Acknowledging the apparent conflicts in opinions, but in light of the fact that the Supreme Court's most recent opinions hold that section 39-13-204(c) expressly exempts evidence in capital sentencing proceedings from the usual evidentiary rules, we must conclude that section 39-13-204(c) means what it says in clear and unambiguous terms: that evidence is admissible in a capital sentencing hearing if it is relevant to establish or rebut a mitigating or aggravating circumstance and the admission of the evidence would not violate the federal or state constitutions.  We emphasize that this interpretation does not allow the state to "run amok" and introduce anything it wants to establish an aggravating circumstance or rebut a mitigating circumstance; introduction of evidence that is so unduly prejudicial that it renders a trial fundamentally unfair would violate the due process clauses of the federal and state constitutions.  See Burns, 979 S.W.2d at 282; Nesbit, 978 S.W.2d at 891.

We conclude that in this case, the defendant opened the door to allow the state to cross-examine the defendant's father regarding his prior convictions by asking the witness "[w]hat kind of person was [the defendant] up through the 25 years of his life that you've known him," (emphasis added), when the defendant was 26 years old at the time of trial.  It is evident from this question, the questions about the defendant's respect for his parents, the questions emphasizing that the defendant was not aggressive, and the questions about the defendant's intercession in an altercation on behalf of his brother, that the defense was attempting to establish the mitigating circumstance that the defendant was and is a person who respects authority as well as a peaceful person who tries to avoid breaking the law.  Thus, the state was entitled under section 39-13-204(c) to rebut this mitigating circumstance with evidence of the defendant's prior convictions.  As noted by the Tennessee Supreme Court in regard to section 39-13-204(c): "Juxtaposed against a capital defendant's right to introduce a broad range of proof in mitigation is the State's right

to offer evidence to rebut the mitigating factors." State v. Reid, 981 S.W.2d 166, 171 (Tenn. 1998).

We also note that the other defense witnesses were arguably called for the purpose of establishing the mitigating circumstance that the defendant was a peaceful family person who respected authority. Indeed, the defendant's brother testified that the defendant was not an aggressive person when he was growing up. In addition, one of defendant's aunts testified that she had observed the defendant while he had been incarcerated and he was a model prisoner who never got into trouble. However, even if the three additional defense witnesses provided no mitigating proof for the state to rebut with evidence of the defendant's prior convictions, any error was harmless because the matter was covered extensively during the cross-examination of the defendant's father and further, as discussed in the previous section of this opinion, the jury had already been properly informed about the defendant's prior aggravated assault convictions.

Of more concern to this Court is the prosecutor's closing remarks. However, we have carefully reviewed the record, and we do not find that these remarks impacted the imposition of the death sentence in this case. Proof of the four aggravating circumstances was strong, and the mitigating evidence did not outweigh these aggravating circumstances. Accordingly, the state's remarks and any error in cross-examining the defense witnesses about the defendant's prior convictions were harmless beyond a reasonable doubt.

### HEARSAY EVIDENCE DURING SENTENCING HEARING

The defendant contends that the trial court erred by excluding evidence of the defendant's remorsefulness at the sentencing hearing as hearsay. Because no offer of proof was made, the defendant requests that this Court remand the matter to the trial court for an offer of proof on this issue pursuant to State v. Goad, 707 S.W.2d 846, 852-54 (Tenn. 1986). We find that the defendant waived this issue on appeal.

During the testimony of the defendant's mother at the sentencing hearing, defense counsel began to ask her whether the defendant had expressed remorse for the

killing. Before the question could be completed, the state objected on the basis that the answer would be hearsay and self-serving. The trial court sustained the objection. The defendant did not respond to the objection, request an opportunity to make an offer of proof, or raise the issue in his motion for new trial. Accordingly, the issue is waived. See T.R.A.P. 36(a); State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988); T.R.A.P. 3(e).

As previously noted, section 39-13-204(c) provides:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee.

Tenn. Code Ann. § 39-13-204(c) (1997). Further, our Supreme Court has held that "[t]his statute expressly exempts evidence adduced in capital sentencing proceedings from the usual evidentiary rules. Hence, evidence concerning a capital defendant's personal or psychological history would clearly be admissible under the above statute." Odom, 928 S.W.2d at 28. Evidence of the defendant's remorse would have been relevant and admissible at the sentencing hearing. Regardless, this issue is waived by the defendant's failure to make a contemporaneous objection. See T.R.A.P. 36(a); Killebrew, 760 S.W.2d at 235. Moreover, the issue was not presented to the trial judge in the motion for a new trial as required by T.R.A.P. 3(e). See State v. Durham, 614 S.W.2d 815, 816 (Tenn. Crim. App. 1981). Finally, there was no offer of proof, leaving this Court with nothing to review.

Despite waiver of this issue, the defendant requests that the matter be remanded to the trial court for an offer of proof pursuant to Goad, 707 S.W.2d 846. This case is readily distinguished from Goad, where the trial court limited the defendant's offer of proof, thus, requiring the matter to be remanded so the trial court could reconsider and rectify its ruling. Id. at 853. Before a trial court can be held in error, it must be given an

opportunity to rule on the issue at an appropriate time during the course of the trial. State v. Walker, 910 S.W.2d 381, 396 (Tenn. 1995). In the present case, the defendant failed to provide the trial court with such an opportunity, and thus, the issue has been waived.

## PROSECUTORIAL MISCONDUCT

The defendant contends that the prosecution's closing argument regarding specific deterrence and future dangerousness was improper in the context of the present case. Specifically, he contends that the state was allowed to argue an irrelevant, non-statutory aggravating circumstance as a reason to impose the death penalty. The Court finds that any error was harmless.

During the prosecution's closing argument at the sentencing hearing, the following comments were made:

> The only verdict that is proper in this case and, again, I do not say this to demean your job, but the only proper verdict that this defendant has earned, that he deserves, that all his life's been crying out for, sentence me to death, because if you don't stop me, if you don't stop me, I'm going to take somebody else away from you. I'm going to take away a valued member of this community if you don't stop me.

Initially, we note that the defendant failed to make a contemporaneous objection to the argument, and thus, the issue has been waived. See T.R.A.P. 36(a); Killebrew, 760 S.W.2d at 235. Nor does this issue appear in the defendant's motion for new trial. See T.R.A.P. 3(e); Durham, 614 S.W.2d at 816. Regardless, the Court finds that the prosecutor's comments constitute harmless error.

A capital sentencing jury is not precluded from consideration of the future dangerousness of a particular defendant where such is a relevant factor under a state's capital sentencing law. See Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); California v. Ramos, 463 U.S. 992, 1001, 103 S.Ct. 3446, 3453, 77 L.Ed.2d 1171 (1983); Spaziano v. Florida, 468 U.S. 447, 461-62, 104 S.Ct. 3154, 3163, 82 L.Ed.2d 340 (1984).

Generally, however, our Courts have held that the issue of specific or general deterrence should be avoided by the prosecution in closing argument at a capital sentencing hearing. See State v. Bates, 804 S.W.2d 868, 881-82 (Tenn. 1991); State v. Irick, 762 S.W.2d 121, 131 (Tenn. 1988). Specifically, the deterrence argument is usually irrelevant to the aggravating circumstances listed in Tennessee's statute. Bates, 804 S.W.2d at 882. Thus, "unless relevant to some theory raised by the State[']s proof, or the defense, it interjects an element into the jury's considerations not provided for by the law." Id. In Bates, the defendant's mitigating theory was that the defendant was mentally disturbed to such a degree that it lessened his culpability, that he would be confined for the rest of his natural life, and that he would be amenable to treatment and rehabilitation. The Supreme Court held that the state's argument concerning specific deterrence was in direct response to the defendant's theory and was not improper under the circumstances. Id.

The state suggests that the argument in question was in response to the defendant's proof showing that he was a model prisoner while incarcerated. While the state argues that the defendant was trying to show he was amenable to treatment and rehabilitation, it is apparent that the defense theory was to show that the defendant would not be a behavioral problem if confined for life. The defense was not attempting to show that if sentenced to life or life without parole, he would not "take away a valued member of this community." The prosecutor should not have made this argument. Regardless, as pointed out in Irick, 762 S.W.2d 121, in reviewing the propriety of argument in a capital sentencing proceeding, the reviewing court must determine whether the prosecutor's comments affected the sentencing decision. Id. at 131. "If the Court cannot say the comments had no effect on the sentencing, then the jury's decision does not meet the standard of reliability required by the Eighth Amendment." Id. (citing Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 2646, 86 L.Ed.2d 231 (1985)). Based on the proof presented, it is clear that these few comments, although improper, did not affect the jury's sentencing decision.

**HEINOUS, ATROCIOUS, OR CRUEL AGGRAVATING CIRCUMSTANCE**

First, the defendant contends that the state failed to present proof of torture. Specifically, he submits that the victim's consciousness can only be a matter of speculation. The defendant argues the same as to whether the victim was suffering from physical or mental pain during this period of time, and, if so, how long and to what extent he suffered. Next, the defendant contends that the state failed to show serious physical abuse beyond that necessary to produce death. He points to the testimony of the medical examiner, who testified that all of the injuries contributed to the victim's death. We find that the evidence supporting this aggravating circumstance was sufficient.

On appeal, the jury's verdict will only be disturbed if, after a consideration of the evidence in the light most favorable to the state, a rational trier of fact could not have found the existence of the aggravating circumstance beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); State v. Williams, 690 S.W.2d 517, 530 (1985).

Tennessee Code Annotated section 39-13-204(i)(5)(Supp. 1995) provides that the death penalty may be imposed if the state proves beyond a reasonable doubt that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Proof of either torture or serious physical abuse beyond that necessary to produce death is sufficient to support the aggravator.

"Torture" has been defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." Williams, 690 S.W.2d at 529. In State v. Odom, 928 S.W.2d 18 (Tenn. 1996), our Supreme Court held that the term "serious physical abuse" as used in the aggravator means something distinct from "torture," that "serious" alludes to a matter of degree, and that the abuse must be physical and must be "beyond that" or more than what is "necessary to produce death." Id. at 26.

In the present case, the victim was shot behind the right ear, and the .22 caliber bullet went through the frontal lobes of the brain and stopped inside the skull above

-32-

the right eye. The back of the victim's left arm was almost completely bruised, and his right arm was bruised as well. There were also bruises on the bottom of the spine and on the right side of the buttocks. There were bruises near the two gunshot wounds on the back of the neck. Some of the bruises, white with purple bruises on either side, were in the shape of a narrow object such as a rod. Overall, the medical examiner testified that the victim was struck a minimum of ten times, and at least six of the blows to the head resulted in a mark. The victim had bitten his tongue several times. Although the medical examiner could not identify the sequence of blows in conjunction with the bullet wound, the anthropologist testified that one blow to the head, which fractured the victim's skull, occurred after the bullet wound. Moreover, the bruises on the back of the arms could indicate that the victim was attempting to defend himself from further blows. See Barber v. State, 889 S.W.2d 185, 189 (Tenn. 1994); State v. Sutton, 761 S.W.2d 763, 767 (Tenn. 1988); State v. Melson, 638 S.W.2d 342, 367 (Tenn. 1982).

When the victim's girlfriend arrived home, the victim was conscious and asked her to call 911. He also was aware that he had been robbed. When the police arrived, the victim was still conscious, and he appeared to be in extreme pain. While the victim could not identify his attackers, he told police that he had been shot in the head. See State v. Smith, 868 S.W.2d 561, 580 (Tenn. 1993). This is sufficient proof to show that the victim was conscious during the attack and that he suffered. The medical examiner testified that the victim would have died from the bullet wound within several hours due to the swelling of his brain, however, the heavy blow which produced blood on the brain also contributed to the victim's death. Finally, the many impacts to the arms, sides, back, and buttocks, each of which represented some bleeding into the skin, if added together, also contributed to the victim's death. While these other injuries contributed to the victim's death, the medical examiner made it clear that the victim would have died within several hours from the bullet wound.

Based on the proof, we find that a rational juror could infer from the above evidence that the victim was subjected to torture and that the murder involved serious physical abuse beyond that necessary to produce death. See e.g., State v. Nesbit, 978

S.W.2d 872, 886 (Tenn. 1998) (victim alive and conscious when injuries were inflicted); State v. Cauthern, 967 S.W.2d 726, 733-34 (Tenn. 1998) (holding evidence sufficient of (i)(5) aggravator when victim was unconscious thirty seconds into attack); State v. Pike, 978 S.W.2d 904, 917-18 (Tenn. 1998) (victim beaten and slashed); Melson, 638 S.W.2d 342 (victim suffered several blows with a ball peen hammer before dying or becoming unconscious); State v. Mann, 959 S.W.2d 503, 511 (Tenn. 1997) (during burglary, victim received 15 blows to the head, was raped, strangled, and stabbed).

Next, the defendant contends that the trial court erred by instructing the jury in the disjunctive, permitting the jury to find either torture or serious physical abuse beyond that necessary to produce death. Accordingly, he argues that the jury rendered its verdict in the disjunctive, and there is no way to determine whether the jurors unanimously agreed on either the basis for finding the aggravating circumstance or the facts in support thereof.

This argument was recently rejected by our Court in State v. David M. Keen, No. 02C01-9709-CR-00365, slip op. at 17 (Tenn. Crim. App., at Jackson, Feb. 10, 1999), transferred, No. 02S01-9903-CR-00022 (Tenn. March 16, 1999). As in Keen, the trial court in the present case properly instructed the jury under the law as to this aggravating circumstance and each of the jurors signed the unanimous verdict indicating their approval of the four aggravating circumstances. See T.P.I. § 7.04(a) (4th ed. 1995); Tenn. Code Ann. § 39-13-204(i)(5)(Supp. 1995). Accordingly, this claim is without merit.

Finally, the defendant contends that the combination of our Supreme Court's broad interpretations of this aggravating circumstance make its application unconstitutional. Specifically, the defendant cites to State v. Williams, 690 S.W.2d 517 (Tenn. 1985), State v. Blanton, 975 S.W.2d 269 (Tenn. 1998), and State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998), as "[t]hree specific 'broadening' constructions by the Tennessee Supreme Court" which defeat the narrowing language of the statute. As an intermediate appellate court, this Court has a duty to apply the law as promulgated by our Legislature or as announced by our Supreme Court. Accordingly, it is beyond the statutory function of this Court to overrule the holdings of our Supreme Court, and we are bound to follow the holdings in

-34-

these cases under the doctrine of stare decisis. See Reimann v. Huddleston, 883 S.W.2d 135, 137 (Tenn. App. 1993). This issue is without merit.

## CONSTITUTIONALITY OF THE DEATH PENALTY STATUTES

While acknowledging that our Supreme Court has upheld the constitutionality of the death penalty statutes, the appellant raises several issues regarding the constitutionality of the death penalty in order to preserve them for later review.

All of the issues raised have been rejected repeatedly by our Supreme Court. See e.g., State v. Keen, 926 S.W.2d 727, 741-44 (Tenn. 1994); State v. Smith, 893 S.W.2d 908, 926 (Tenn. 1994); State v. Brimmer, 876 S.W.2d 75, 86-88 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253, 268-70 (Tenn. 1994); State v. Smith, 857 S.W.2d 1, 21-24 (Tenn. 1993); State v. Black, 815 S.W.2d 166, 178-79 (Tenn. 1991); State v. Boyd, 797 S.W.2d 589, 599 (Tenn. 1990); State v. Teel, 793 S.W.2d 236, 251 (Tenn. 1990); State v. Thompson, 768 S.W.2d 239, 252 (Tenn. 1989).

## PROPORTIONALITY REVIEW

The state submits that the death sentence in this case was not imposed in an arbitrary fashion, that the record supports the jury's finding that the four aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, and that the death sentence in this case is neither excessive nor disproportionate to the penalty imposed in similar cases.

Pursuant to Tennessee Code Annotated section 39-13-206(c)(1)(D), a comparative proportionality review must be undertaken in all capital cases. In conducting a comparative proportionality review, the Court must begin with the presumption that the sentence of death is proportionate to the crime of first-degree murder. State v. Hall, 958 S.W.2d 679, 699 (Tenn. 1997). A death sentence will be considered disproportionate if when taken as a whole, the case is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." State v. Bland, 958

S.W.2d 651, 665 (Tenn. 1997). A sentence of death, however, is not disproportionate merely because the circumstances are similar to those in another case in which a defendant received a life sentence. Hall, 958 S.W.2d at 699. The role of this Court in conducting comparative proportionality review is to assure "that no aberrant death sentence is affirmed," not to assure that a sentence "less than death has never been imposed in a case with similar characteristics." Id.

In comparing similar cases, the Court must consider many factors, including (1) the means of death, (2) the manner of death, (3) the motivation for the killing, (4) the place of death, (5) the similarity of the victims' circumstances including age, physical, and mental conditions, and the victims' treatment during the killing, (6) the absence or presence of premeditation, (7) the absence or presence of provocation, (8) the absence or presence of justification, and (9) the injury to and effects on nondecedent victims. Bland, 958 S.W.2d at 667.

In comparing similar defendants, the Court must consider variables such as: (1) the defendant's prior criminal record or prior criminal activity, (2) the defendant's age, race, and gender, (3) the defendant's mental, emotional, or physical condition, (4) the defendant's involvement or role in the murder, (5) the defendant's cooperation with authorities, (6) the defendant's remorse, (7) the defendant's knowledge of helplessness of the victim(s), and (8) the defendant's capacity for rehabilitation. Id.

Comparative proportionality review is not a rigid, objective test. Id. at 668; Hall, 958 S.W.2d at 699. This Court does not need to "employ a mathematical formula or scientific grid." Hall, 958 S.W.2d at 699. Rather, in using these factors to compare the circumstances of this case to other death penalty cases, this Court must rely upon "the experienced judgment and intuition of its own members." Bland, 958 S.W.2d at 668.

Based on a review of the cases listed below, the Court concludes that the death penalty in this case was neither arbitrary nor disproportionate.

In State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998), the victim sustained a contact shotgun wound to the side of her head. The murder occurred when the victim and her husband came home to find the 22-year-old defendant and a second assailant burglarizing their home. The jury found two aggravating circumstances: (1) the defendant had previously been convicted of one or more felonies whose statutory elements involve the use of violence and (2) the murder was committed while the defendant was engaged in committing or was attempting to commit a burglary. Tenn. Code Ann. § 39-13-204(i)(2) and (7) (Supp. 1993).

In State v. Mann, 959 S.W.2d 503, the 23-year-old defendant unlawfully entered the home of the victim, who received 15 separate blows to the head and who was also raped, strangled, and stabbed. The jury found two aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel and (2) it was committed while the defendant was engaged in committing a burglary. Tenn. Code Ann. § 39-13-204(i)(5) and (7) (1991 Repl.).

In State v. Pike, 978 S.W.2d 904 (Tenn. 1998), the victim sustained at least four heavy blows to the head. The victim's body had multiple cuts and slashes, including a slashed throat. There were also defensive wounds. The defendant was 18 years old at the time of the murder. The jury found two aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel and (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution. Tenn. Code Ann. § 39-13-204(i)(5) and (6) (Supp. 1993).

In State v. House, 743 S.W.2d 141 (Tenn. 1987), the defendant, in his early twenties at the time of the offense, killed the victim with a severe blow to the left forehead. The victim's body was badly bruised and there were abrasions and blood indicating that she had been in a fierce struggle. The victim was also partially strangled. Three aggravating circumstances were found by the jury: (1) the appellant had previously been convicted of a felony involving the use or threat of violence to the person, (2) the homicide was especially heinous, atrocious, or cruel, and (3) it was committed while the appellant

was committing or attempting to commit or fleeing from the commission of rape or kidnapping.  See Tenn. Code Ann. § 39-2-203(i)(2), (5), and (7) (1982) (repealed 1989).

In State v. Barber, 753 S.W.2d 659 (Tenn. 1988), the 29-year-old defendant burglarized the home of the elderly victim, who was struck in the head at least five times with a blunt instrument.  The jury found that the murder was especially heinous, atrocious, or cruel and that the appellant was engaged in committing larceny.  See Tenn. Code Ann. § 39-2-203(i)(5) and (7) (1982) (repealed 1989).

In State v. Cazes, 875 S.W.2d 253 (Tenn. 1994), the victim was raped and sustained multiple blows to the head with a blunt instrument.  There were also numerous marks and bruises found on the victim's body.  The jury found three aggravating circumstances: (1) the defendant had previously been convicted of one or more violent felonies, (2) the murder was especially heinous, atrocious, or cruel, and (3) the murder was committed while engaged in a felony.  Tenn. Code Ann. § 39-2-203(i)(2), (5), and (7) (1982) (repealed 1989).

Moreover, the same four aggravating circumstances as in this case were found in State v. Caruthers, 676 S.W.2d 935, 938-39 (Tenn. 1984) (Jury found the aggravating circumstances set forth in Tenn. Code Ann. § 39-2404 (i)(2), (5), (6), (7) (Supp. 1980) (repealed 1982)).

While "[n]o two cases are alike, and no two defendants are alike," Barber, 753 S.W.2d at 665, the above-mentioned cases bear many similarities with the case now before the Court.  Based on the similarities between these cases and the one now before the Court, imposition of the death penalty is not aberrant, nor is its application to the defendant excessive or disproportionate.

**CONCLUSION**

In conclusion, we find that the evidence is sufficient to support the jury's finding that the defendant is guilty of premeditated murder.  While error occurred during

the trial, we have carefully reviewed the record and have concluded that such error did not affect the verdict. We also find the evidence sufficient to support the sentence of death. Again, while error occurred during the sentencing hearing, we find that such error was harmless and did not affect the jury's verdict. Moreover, we have conducted a comparative proportionality review and have determined that the sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar cases. Finally, although not raised, we have reviewed the record and find that the evidence is sufficient to support the defendant's conviction for especially aggravated burglary.

Accordingly, we affirm the defendant's convictions of premeditated murder and especially aggravated burglary, and we affirm his sentence of death.

_____
THOMAS T. WOODALL, Judge

CONCUR:

_____
DAVID G. HAYES, Judge

_____
JOE G. RILEY, JR., Judge